### WELCH et al. v. HASSETT.

### No. 6469.

District Court, D. Massachusetts.

July 20, 1936.

Henry Hickson Meyer and Edward C. Thayer, both of Rackemann, Sawyer & Brewster, and Claude R. Branch and John L. Hall, both of Choate, Hall & Stewart, all of Boston, Mass., for plaintiff.

Francis J. W. Ford, U. S. Atty., of Boston, Mass., for defendant.

SWEENEY, District Judge.

This is an action at law to recover estate taxes alleged to have been illegally assessed and collected. The plaintiffs are the executors of the will of Frank H. Beebe, who died on November 20, 1932. The will of the decedent, under which the plaintiffs were named as executors, was duly proved and probated on December 27, 1932.

Five trusts which were set up by the decedent during his lifetime were declared by the Commissioner of Internal Revenue to have been testamentary in character,

made in contemplation of death, and intended to take effect in possession or enjoyment at or after the death of the decedent. It would follow that, under section 302(c) of the Revenue Act of 1926 (44 Stat. 70), the value of these trusts should have been included in the gross estate of the decedent subject to estate tax. As a result of the finding of the Commissioner of Internal Revenue, the gross estate of the decedent was determined to be $5,877,954.36. The net estate was determined to be $5,312,194.11, resulting in a total estate tax of $1,094,991.06 after the allowance of certain credits. On this computation a deficiency of $757,205.34 was determined, of which $514,718.92 principal and $41,544.17 interest were paid on May 2, 1935. The balance of the deficiency, namely, $242,486.42, has been withheld from assessment in view of the instant litigation, and in order that the executors might have an opportunity to claim further credit for state inheritance tax payments.

On May 31, 1935, the plaintiffs filed with the Commissioner of Internal Revenue a claim for refund in the amount of $553,813.94 on the ground that the five transfers declared by the Commissioner to have been testamentary in character, made in contemplation of death, and to take effect in possession or enjoyment after the death of the decedent, were not such either in fact or law. The claim for refund was rejected by the Commissioner on June 11, 1933.

### Findings of Fact.

The decedent was the son of James M. Beebe, who died about 1875, and whose estate early in 1919 was being administered by E. Pierson Beebe, a brother of the decedent, and Francis C. Welch, the father of the plaintiff Welch, as cotrustees. This estate in 1919 was worth about $3,000,000.

Up to 1919 E. Pierson Beebe, in addition to administering the estate of James M. Beebe, had the investment and management of the estate of the decedent, although under no instrument of trust or other legal relationship. By his advice and his activities in behalf of the decedent he had materially increased the decedent's estate. Some time in 1919 Francis C. Welch, one of the cotrustees of the James M. Beebe estate, died, and his son, E. Sohier Welch, a plaintiff here, succeeded him as cotrustee of that estate. On March 1, 1919, E. Pierson Beebe was declared, by a court of competent jurisdiction, to be an insane person, and incapable of caring for himself, and the decedent succeeded him as a cotrustee of the estate of James M. Beebe.

On April 8, 1919, Frank H. Beebe and E. Sohier Welch were appointed guardians of the person and estate of E. Pierson Beebe, and continued as such until his death on August 8, 1926. At the time of the appointment of guardians, the estate of E. Pierson Beebe was worth between six and seven million dollars. Welch later became the guardian of C. Philip Beebe, who was adjudged insane about 1920, and whose estate was worth approximately two or three million dollars.

As a coguardian of E. Pierson Beebe, the decedent had the custody of a will which had been drawn by E. Pierson Beebe prior to his having been declared incompetent. Under this will the decedent was to receive one-half of the E. Pierson Beebe estate.

Upon assuming the coguardianship of the estate of E. Pierson Beebe and the cotrusteeship of the estate of James M. Beebe, the decedent retained the old offices and clerks of E. Pierson Beebe at No. 6 Beacon Street, Boston. At first he became active in the management of these two trusts, frequently consulting Welch with regard to management and investment. The decedent was enjoying excellent health, and was a man of wealth in his own right. Up to this time his interests had not been those of a businessman. He loved art, music, flowers, and pictures; was a regular patron of the opera and concerts; spent much of his time in the woods among the trees and flowers; and annually planned the flower garden for his huge summer estate at Falmouth. He was fond of animals; was a collector of paintings and pictures. He was not interested in the business world, and many times expressed a distaste for it. He had followed the pursuits of a true gentleman of leisure whose tastes were æsthetic.

After a short time he became dissatisfied with the burdens he had assumed, and in April of 1921, desiring to be relieved of them, and at the suggestion of the plaintiff Welch, secured the services of Sylvester Brown, who became the office manager for the decedent. Brown's activities were principally in connection with the estate of James M. Beebe and the coguardianship of the estate of E. Pierson Beebe. Gradually he took over nearly all of the

694

decedent's work as cotrustee and coguardian.

The decedent was fond of travel, and made frequent trips to Europe. In the summer of 1923, while visiting in England, he had some bladder trouble, consulted a physician, and was catheterized by him. During the last week of February, 1924, the decedent consulted his family physician, told him of his experience in London, and of the fact that the English physician had advised that an operation would be necessary. He was referred by his physician to a specialist. After consultation with the specialist, and about February 25, 1924, the decedent advised his housekeeper that he was going to submit to an operation, and that he was going to Falmouth for a couple of weeks of rest before submitting to it. She advised against the delay, and on February 29th he entered the hospital for the operation. After a period of pre-operative rest, a prostatectomy was performed on March 5th. At that time the decedent was nearing his seventy-first birthday. A short time later a secondary operation was performed. After a normal convalescence, the decedent was discharged from the hospital on April 15, 1924, and, after regaining his strength, continued in good health until shortly before his death on November 20, 1932. Death was due to myocarditis and arteriosclerosis, which had their inception about 2 months before his death.

Prior to the 1st of January, 1924, the decedent had made modest financial contributions to relatives and persons close to him. Some time between the 1st and the 15th of January the decedent first discussed with E. Sohier Welch the possibility of creating certain trusts in order that he might be relieved of the importunities of these relatives and friends, and in order that the beneficiaries of his generosity would receive regular payments from the trust rather than the hit or miss gifts that he had previously made to them. A second conference was held between the two during which the provisions of the trusts were discussed, and on February 13, 1924, the decedent executed four trusts which will hereinafter be referred to as trusts A, B, C, and D. On the same day he also attempted to create a fifth trust which will hereinafter be referred to as the Frank H. Beebe trust, and which will be separately discussed. Two days later he made changes in his will so as to avoid the possibility of a duplication of gifts.

Trust A, in the amount of $25,000, was to run for a period of 20 years, unless earlier terminated by the trustees. As a matter of fact, this trust was terminated prior to the death of the decedent, and the principal was distributed before his death. The income from this trust had been paid two-fifths to a lawyer friend, one-fifth to a clergyman, and two-fifths to the caretaker of the decedent's estate. Upon the termination of the trust, one of the beneficiaries of the trust having died, one-fifth part of the principal was returned to the decedent in accordance with the terms of the trust. The other four-fifths were distributed in equal shares to the other beneficiaries named in the trust. Regardless of the facts surrounding the creation of the trust, at its termination, the transfer was complete, and the decedent had parted with his entire interest in the fund.

Trust B was in the amount of $100,000, and was for the benefit of Mary Van Arnam Brown, a first cousin of the decedent. Up to the time of the creation of this trust, the decedent had augmented her moderate income by giving her sufficient to live on. Under the trust she received between $4,500 and $5,000 a year. The trust further provided that after the death of the said Mary Van Arnam Brown the income was to be distributed among a class of people to the last survivor, and, after the death of the last survivor, the principal of the trust, as it then existed, was to be distributed among the living issue of the class referred to per stirpes. Under this trust it is apparent that the decedent parted with all interest in the trust fund, and that the transfer was complete.

Trust C, in the amount of $125,000, provided that the income from that fund should be payable in stipulated amounts to certain employees and friends of the decedent during the term of the trust, and, upon the death of the last survivor of them and certain other persons mentioned in the trust, the principal of the fund was to be paid to the living issue of five nieces and nephews of the decedent. In this trust the decedent parted with all interest in the trust fund, the transfer was complete, and under it there could be no reversion to his estate.

Trust D, in the amount of $10,000, provided for payments of income to one Sarah B. Field, a school teacher in the city of Boston, and an old friend of the decedent, to whom he had previously made other gifts during her life, and upon her death

the fund as it then existed was to revert to trust C set forth above. The beneficiary of trust D died during the lifetime of the decedent, and the trust fund was actually absorbed by trust C.

On February 13, 1924, the same date on which trusts A, B, C, and D were carved out of his own estate, the decedent attempted to create a fifth trust, previously referred to as the Frank H. Beebe trust. The trust fund was to be derived from a legacy contained in the will of E. Pierson Beebe, who was then living, but under guardianship as an incompetent. Under the will made before he was declared insane, he had left about one-half of his estate to the decedent, who attempted to create a trust therefrom, reserving to himself the income for life. After his death, the income was to be divided one-third to George Stanley Fiske, during his lifetime, and thereafter to his issue; one-third to his niece, Esther Fiske Hammond, during her lifetime, and thereafter to her issue; and one-third part to the issue of Esther Fiske Hammond; and on default of any such issue the income was to be added ratably amongst the other beneficiaries. He further provided that, upon the death of the last survivor of the decedent, his nephew George Stanley Fiske, his niece Esther Fiske Hammond, and the children of Esther Fiske Hammond, the principal of the estate as it then existed was to be paid over one-third to the then living issue of George Stanley Fiske, and two-thirds to the surviving issue of his niece, Esther Fiske Hammond, with the provision that, in the event that there were no survivors of his niece or nephew, the principal was to be paid to "those persons who would have been entitled to receive the same according to the laws of the Commonwealth of Massachusetts then in force" as if it had been the absolute property of the decedent. This instrument contained no warranty or covenant, nor any statutory language operating as a warranty or covenant, and no consideration was paid by the grantees or the beneficiaries to the decedent. Whether or not this instrument was a valid trust by reason of the fact that the corpus disposed of in the trust instrument could not accrue to the decedent until after the death of E. Pierson Beebe is not now important, as after the death of E. Pierson Beebe the decedent ratified and confirmed the original trust instrument, making no change whatsoever in its provisions. The confirmation and ratification was brought about by the fact that an attorney to whom the matter was submitted on the death of E. Pierson Beebe gave his opinion to the effect that the instrument of February 13, 1924, was not a valid trust instrument for reasons that he then stated. Acting on the advice of the attorney, a confirmation and ratification of the instrument was made. While this was being done, the decedent caused the number of trustees to be changed from two, as written in the original instrument, to three, and caused himself to be elected one of the trustees. His purposes in having himself appointed a trustee were (1) to have the name of Beebe connected with the trust, and (2) because he wanted part of the commissions. His purposes in establishing the trust itself were (1) to relieve himself of the burdens of management of this legacy, and (2) to avoid the importunities of his family and his friends. All of the beneficiaries named in it were either those who on his death would be his heirs or their issue.

In 1926 and 1927, Welch, Brown, and the decedent, as trustees, received the property to which the decedent became entitled under the will of E. Pierson Beebe. These three up to the time of the death of the decedent, and Welch and Brown since then, have been holding that property, and handling it under the terms of the instruments executed on February 13, 1924, and October 22, 1926. Copies of the instruments have been filed with the register of the probate court, and the trustees' accounts have been allowed from time to time. In all five trusts, the trustees named were E. Sohier Welch and Sylvester Brown. In addition to acting as cotrustee under these trusts, Welch was cotrustee with the decedent of the estate of James M. Beebe, coguardian of the estate of E. Pierson Beebe, guardian of C. Philip Beebe, and was also Frank H. Beebe's attorney. Sylvester Brown was a brother of George Brown, who in turn was a partner of E. Sohier Welch.

### Conclusions.

As to trusts A, B, C, and D, I find and rule that the transfers made by the decedent were not testamentary in character, made in contemplation of death, or intended to take effect in possession or enjoyment at or after the death of the decedent, and that the gross estate of the decedent should not include the value of those trusts. The decedent had for many

years contributed to the beneficiaries, and his dominant motives in the creation of the trusts were to relieve himself from the burden of further caring for these individuals personally, to relieve himself from their importunities, and to guarantee a regular payment of income to the recipients. With the exception of trust A, the decedent parted with all interest in the funds, created no right of reversion, and the transfers were complete during his lifetime. The fact that the decedent was about to undergo an operation, with a resultant possible apprehension of death therefrom, may have provided the occasion for the creation of the trusts, but can hardly be said to have been the dominant motive. I find that the dominant motives were as previously stated, and that they were more consistent with life than with death.

As to trust A, the trust having been executed during the lifetime of the decedent, and the decedent having accounted in his income tax return for the one-fifth share received from that trust, we need only consider the distribution of the remainder of that trust. Upon the termination of the trust, the other four-fifths of the trust fund were paid to the surviving beneficiaries, and, as to this four-fifths interest, the donor parted with his entire interest, the transfer was complete, and this fund was not taxable as part of his estate.

There is nothing in the evidence to warrant my finding that in the creation of trusts A, B, C, and D the decedent was actuated by the thoughts of death either imminent or remote.

■ As to the fifth or Frank H. Beebe trust, it would appear at first glance to be similar to a trust held valid in Helvering v. City Bank Farmers Trust Company, 296 U.S. 85, 56 S.Ct. 70, 80 L.Ed. 62, yet a close examination of the facts indicates that in the present case the decedent was actuated by a motive or an intent other than to make a present complete and outright gift. Decision as to taxability does not stand or fall on the type of instrument chosen to effect the transfer. It is brought within the statute if, from the context of the instrument and the facts surrounding it, it can be found that the purposes actuating the settlor were to make what was in effect a testamentary disposition. The statutory description embraces gifts inter vivos, despite the fact that they were fully executed, are irrevocable and indefeasible. United States v. Wells, 283 U.S. 102–116–117, 51 S.Ct. 446, 75 L.Ed. 867. The dominant purpose of the statute is to reach substitutes for testamentary dispositions, and thus to prevent the evasion of estate tax. United States v. Wells, supra.

■ The decedent was more than 70 years of age, had never married, and was the possessor in his own right of an independent fortune. He was a man who did not want to be bothered with business details, and the thought of succeeding to an estate of approximately another $3,000,000 was disconcerting because of the necessity of its management. He was apparently perfectly willing to receive all of the income that might be drawn from the fund, but did not want to have the burden of its management. Indeed, the prime purpose advanced by the plaintiffs for the creation of this trust was to relieve the decedent of the burdens of management. Such a purpose, while equally consistent with life or death, does not evince an intent to make a then present gift of the property to others. The fact that he had himself appointed a trustee in order to take advantage of the commissions accruing to the trustees indicates his unwillingness to part during his life with any of the earnings of that estate directly or indirectly. To my mind, this is not consistent with such an inter vivos gift as would in and of itself be exempt from the statute. The added reason that he had for the creation of the trust, and the only other reason advanced by the plaintiffs, was a desire to rid himself of the demands of friends and relatives. The creation of a trust, and the placing of title to the property in the trustees for these purposes, while equally consistent with life or death, is not persuasive of a desire to make a then present complete and outright gift. His motives could have been satisfied by the creation of a simple trust with the reservation of a power of testamentary disposition, or by the direct employment of a manager of the fund. What he really intended to do was to effect an arrangement that would relieve him of the burdens of his brother's estate, and rid him of the importunities of his friends and relatives. His real purpose was not to establish a trust for others, or to make a then present transfer of the property to others. The trust instrument was merely the vehicle that he chose to accomplish his purposes of avoiding the burden of managing the es-

tate as well as the importunities that would naturally follow the ownership of such an estate. Having accomplished his purposes, he took one step more, and in the same instrument made provisions for the distribution of this fund and its income to take effect after his death. There has been no reason advanced by the plaintiffs why the decedent took this added step, or why he chose an instrument that not only would accomplish the purposes that he had in mind, but which would tend to relieve his estate from the burden of estate taxes.

The plaintiff Welch testified, and I find as a fact, that Welch advised the decedent on financial matters and matters of investment, and that Welch's partner, one George Brown, advised the decedent on tax matters. Brown's testimony was not adducible at the trial, but Welch's testimony to the effect that neither he nor Brown ever discussed estate taxes with Beebe, although admitting the discussion of income taxes with Beebe, falls far from being convincing that the decedent did not receive advice on estate tax matters from Brown or others. That the decedent chose an instrument designed not only to accomplish the purposes that he had in mind, but well designed to relieve his estate from estate taxes to the extent of that fund, and an instrument which disposed of that property after his death, strongly indicates a transfer that was not only testamentary in character, but intended to take effect in possession or enjoyment after his death. Having considered all of the evidence in the case with its logical inferences, I find that one of the major motives which induced the creation of this trust was to dispose of the estate received from his brother after having reserved to himself for life the entire income from that estate to the last possible demand.

I am of the opinion that the facts in this case are vastly different from those in the line of cases holding gifts inter vivos valid where a settlor has set aside out of his own property a trust fund for others, and has merely reserved the income from that fund to himself for life. In such cases, the dominant motive seems to be the setting up of a trust for others, and the incidental retention of the income for the life of the settlor. In the present case the dominant motive seems to be the retention of the income for the life of the settlor, and the incidental setting up of a trust to accomplish this purpose. There is

lacking an intent or motive to make a then present gift, and it is only by virtue of the instrument used to accomplish the purposes of the decedent that there can be any claim of a right to dispose of the property after the death of the decedent as a mere incident to the trust. It is at such subterfuge that section 302(c) of the Revenue Act of 1926 is aimed. No one could quarrel with the decedent in so far as he set up a trust fund, or took any other step to rid himself of the burden of management of the fund, or to be rid of the importunities of his friends and relatives, but, when he took the added step of disposing of this legacy as an incident to the vehicle that he had chosen to accomplish his purposes, I cannot believe that in taking that additional step he intended to do other than to make a testamentary disposition, or that in taking any of the steps he intended to divest himself of the possession or enjoyment of the legacy, or transfer such possession or enjoyment to others at any time prior to his death.

I therefore rule that the transfer and trust involved in the Frank H. Beebe trust was testamentary in character, made in contemplation of death, and intended to take effect in possession or enjoyment after the death of the testator.

In view of the foregoing, it is unnecessary to consider either the retroactivity or the constitutionality of the amendments to section 302(c) of the Revenue Act of 1926 made in 1931 (46 Stat. 1516) or 1932 (26 U.S.C.A. § 411(c)).

The Commissioner determined the net estate of the decedent to be $5,312,194.11. From this amount should be deducted the total value of trusts A, B, C, and D as set up in such determination. After this deduction has been made, the estate tax should then be computed in accordance with the schedule in force on the date of the decedent's death. Judgment may be entered for the plaintiffs in the amount of the tax that has been assessed and paid over and above that resulting figure, with interest at the rate of 6 per cent. per annum from the date or dates of overpayment, if any, with costs. The computation of the actual judgment may be determined by agreement of counsel, or, if unable to agree, upon application by either party, the question will further be considered by the court.

The defendant's motion for judgment is denied.

698

The plaintiffs' requests for rulings of law are allowed in so far as they are consistent with this opinion, and are denied in so far as they are inconsistent. The defendant's requests for rulings of law are allowed in so far as they are consistent with this opinion, and are denied in so far as they are inconsistent.