O'CONNOR et al. v. UNITED STATES.

District Court, S. D. New York.

April 5, 1948.

Edward F. Clark, of New York City (Edward F. Clark and Leonard J. Reynolds, both of New York City, of counsel), for plaintiffs.

John F. X. McGohey, U. S. Atty., of New York City (John B. Creegan, Asst. U. S. Atty., of New York City, of counsel), for defendant.

BYERS, District Judge.

The only question for decision is whether the plaintiffs' claim for relief in the sum of $3,108.67, overpayment of Federal Estate tax, and $358.00 overpayment of interest, making together $3,466.67, with interest from December 1, 1939, the date of payment of both items, can be defeated by the matters pleaded by the Government by way of avoidance..

The facts are stipulated, and may be briefly summarized as follows:

James O'Connor died October 4, 1936, owning 20% of the stock of Canobie Corporation (namely, 7,000 shares), a company organized under the laws of Delaware, to hold the properties and assets of five brothers who were equal owners of the stock. That company was the record owner of sundry corporate stocks and bonds, and received and disbursed the income therefrom according to the corporate purpose and practice.

The Executors of James O'Connor elected to return the value of his shares, for the purposes of the estate tax, as at the anniversary of his death (according to the applicable provisions of the Revenue laws) at 85% of the book value thereof. An estate tax was paid on January 4, 1938, of $36,390.34, which was computed on that valuation, plus income received during the twelve months which elapsed after the decedent's death, the gross estate so returned for taxation being $402,839.20 which included the Canobie stock owned by James and one-quarter of that which had been owned by his brother Charles and devolved upon the former. This subject will be referred to later.

The items of post-mortem income included in that figure were $15,625.00 and $3,-423.64, amounting together to $19,048.64.

The plaintiffs seek a refund for overpayment of tax on that income item, which income is computed at $18,639.99. The difference between these two figures of $408.65 does not require explanation for present purposes.

The basis of the plaintiffs' claim is the improper inclusion of the post-mortem income as a sum added to the valuation to be attributed to the decedent's Canobie stock at the date of his death. That sum was required to be included in the return according to Article 11 of Treasury Regulations 80 (1937) which was approved in Saks et al. v. Higgins, 2 Cir., 111 F.2d 78, decided April 8, 1940, affirming the deci-

sion of the District Court, 29 F.Supp. 996 dated October 27, 1939.

█ The tax payment based upon the return as filed, which included the item in question, must therefore be deemed to have been made under compulsion.

The 85% valuation of the Canobie stock was not acceptable to the Bureau of Internal Revenue, which insisted upon a valuation of 100% according to the market values of the securities owned by the corporation; thus an additional levy of $9,640.05 was laid as a deficiency assessment.

Since the issue so raised applied as well to the stock standing in the name of James as to that belonging to Charles (of which James inherited one-quarter), it will be seen that, in connection with the estate tax to be paid on Charles' stock, the question was appropriate for litigation, and so the matter was pending in the Board of Tax Appeals, Charles having predeceased James. In that controversy, the same issue was presented as to whether the Canobie stock should be valued at 100% or 85%. Settlement of that controversy was agreed to as the result of negotiation, upon a fifty-fifty basis, and valuation at 92½% was thereby sanctioned, according to a stipulation dated November 20, 1939, which was the basis of an order of the Board of Tax Appeals dated December 6, 1939.

It was further agreed, between the Bureau and the attorney who appeared for the personal representatives of both Charles and James, that the valuation so mutually consented to should govern not only the stock which James inherited from Charles, but also the stock which James had owned in his own right. To this extent the estate tax proceedings in the two estates were interwoven and necessarily uniform in result so far as the valuation of the Canobie stock was concerned.

█ Since the return in the estate of Charles was based· upon a valuation fixed at the date of his death, February 12, 1936 (nearly eight months prior to that of James), no question there arose concerning post-mortem income. It is a fair inference therefore, that the agreement to value the Canobie stock at 92½% in both estates reflected a recognition by the Bureau that the figures representing post-mortem income in the return made for James' estate had to do with an element of value that was apart from the agreed valuation of the stock itself. That understanding would have been entirely compatible with the Supreme Court decision later to be noticed.

This means that, if it had been intended to argue (should the occasion arise in the then future) that the possible elimination of that separate item from the taxable property of James would affect the 92½% valuation, the occasion would have been appropriate to impose upon the Executors of James an undertaking not to seek any recovery for an alleged overpayment in that connection, in the waiver next to be discussed. Such an agreement would have been in line with the practice disclosed in Castell v. United States, 2 Cir., 98 F.2d 88. The absence of such a provision from this waiver will be seen to establish a line of demarcation between that case and this.

The negotiated settlement in this case fixing the valuation of Canobie stock at 92½% resulted in the execution by plaintiffs of a waiver of restriction against immediate assessment, etc., on November 13, 1939, in the following form:

"C–TS:NYD

"JJC

"Waiver of Restriction Against Immediate Assessment and Collection of Deficiency in Estate Tax

"MT–ET–14th New York.

"District–14th New York.

"Pursuant to the provisions of section 308(d) of the Revenue Act of 1926 [26 U.S.C.A.Int.Rev.Acts, pages 244, 245], the undersigned executors of the Estate of James O'Connor, waive the restrictions provided in section 308(a) of the Revenue Act of 1926 as amended and consent to the assessment and collection of a deficiency in estate tax in the sum of $5,030.37 together with interest thereon as provided by law.

"This Waiver of Restrictions is subject to acceptance by or on behalf of the Commissioner on the basis of the adjusted liability as hereinabove proposed. and· if not thus accepted will have no force or effect.

"If this proposal is accepted by or on behalf of the Commissioner, the taxpayers agree: (1) to make payment of the above-stated deficiency, together with interest as provided by law, promptly upon receipt of notice and demand from the Collector of Internal Revenue, and (2) upon request of the Commissioner, will execute at any time a final closing agreement as to the estate tax liability on the foregoing basis under the provisions of Section 3760 of the Internal Revenue Code [26 U.S.C.A.Int.Rev. Code, § 3760].

"Elizabeth O'Connor
"Executor
"19 Gerlach Place, Larchmont, N. Y.
"Address
"James O'Connor Jr.
"Executor
"19 Gerlach Place, Larchmont, N. Y.
"Address"

"New York, New York.
"Dated: November 13th, 1939
"JJC/mog"

The accepted deficiency tax of $5,030.37 plus interest of $578.15 was paid December 1, 1939. The 3-year statute of limitations, 26 U.S.C.A.Int.Rev.Code, § 874, with reference to the original return and payment made therewith, expired January 3, 1941.

The same statute, with reference to the said deficiency tax, expired December 1, 1942.

■ This claim for refund applies to the last-mentioned item only, and was filed April 18, 1941, and was rejected August 26, 1941, and this suit was commenced April 18, 1942, and therefore is timely.

The occasion for filing the claim was the reversal by the Supreme Court on March 3, 1941, of the case of Saks et al. v. Higgins, supra (see Maass v. Higgins, 312 U.S. 443, 61 S.Ct. 631, 85 L.Ed. 940, 132 A.L.R. 1035) based upon the decision that the regulation requiring the inclusion, for the purposes of the Federal Estate tax, of post-mortem income during the 1–year elective period following the death of the owner of the property, was not required by law, and that the regulation under which it was included in the return was invalid.

The necessary effect of that decision was to notify these Executors that they had paid to the United States a sum of money, under the guise of an exaction for estate taxes, for which there was no legal warrant, although of course the Executors had made the payment only under the compulsion of an official regulation.

It is clear that recovery must be awarded to them, unless, as the Government asserts, they have bargained away this right of which they were not, and legally could not have been aware, when they signed the waiver to which reference has been made.

■ The position of the Government seems to ignore the fiduciary nature of the plaintiffs' status. They owed a duty to the United States to pay every cent of tax which was legally laid upon the property which they were required to administer; they also owed to the beneficiaries under the Will of James, the duty not to pay out one penny that the law did not exact.

Had they not instituted this cause, they would have been derelict in respect of their fiduciary responsibilities. This ought to be a sufficient answer to the imputation of repudiation of an agreement on the part of the plaintiffs, which appears in the Government's brief.

The Answer pleads the waiver in three aspects: (a) Prior settlement by agreement; (b) Estoppel or accord and satisfaction; and (c) Offset.

It will be convenient to consider the first two together, since they involve but one topic.

As to the first, the language of the first two paragraphs of the waiver is compatible only with a desire to promptly pay an agreed sum, to save further interest, which desire may be defeated at the option of the Commissioner. Assuming acceptance by the latter (which occurred) the third paragraph says that the Executors agree (1) to pay promptly, and (2) "upon request of the Commissioner, will execute at any time a final closing agreement as to the estate tax liability on the foregoing basis under the provisions of Section 3760 of the Internal Revenue Code".

No such agreement was requested up to the institution of this suit, so that the plaintiffs are not in default for having refused to enter into one. It is therefore

unnecessary to consider whether by any legal process they could have been relieved from such an agreement by virtue of later legal developments.

Although there was no such agreement, the Government argues that the plaintiffs are to be treated as though there were, but the contention is obviously unsound. The cases cited have been consulted, and are found wanting in resemblance: This is not an action in which recovery is sought of payments made under a compromise, because this item was not in controversy; nor of payments made pursuant to decision of the Tax Court; nor is repudiation sought of a compromise entered into before the Board of Tax Appeals.

More important, it is not an effort made to recover an overpayment in the face of an agreement not to do that very thing despite possible future developments, as in Castell v. United States, 2 Cir., 98 F.2d 88 (see page 91 for a precise statement of the difference between that case and this).

The basis for the Government's argument, that this waiver should be accorded the legal status of the compromise agreement contemplated by Section 3760, necessarily disintegrates in face of the decision of the Supreme Court in Botany Worsted Mills v. United States, 278 U.S. 282, at page 289, 49 S.Ct. 129, at page 131, 73 L.Ed. 379.

That case was cited in this Circuit as recently as last October in United States v. Lustig et al., 2 Cir., 163 F.2d 85, at page 89.

It is quite clear that the terms of the waiver under which the payment of December 1, 1939, was made did not in law or good faith require these plaintiffs not to seek to recover the item now in suit.

■ Nor can I discover the basis of an estoppel as against the plaintiffs; and if I am wrong in this, it is at least mutual. Both parties to the controversy waived the right to continue to litigate in the then Board of Tax Appeals. Each side agreed to forego the right to seek adjudication of the valuation of Canobie stock and each conceded one-half of its contention in exchange for a like concession by the other. For reasons which have been stated, the settlement as to the estate of Charles was necessarily imported into the estate of James, both as to benefits and burdens.

The only change in position to be attributed to the Government, as to the latter estate, was to accept the valuation and the tax paid thereon; but that was no real change, for the acceptance, as to so much of James' estate as represented his inheritance from Charles, was an acceptance pro tanto, as to James, from which even departmental dexterity would have found escape effectually blocked.

The Government did not permit the statute of limitations to run as to the original payment of tax, relying upon the plaintiffs' undertaking to execute the closing agreement, but because it was satisfied with the 92½% valuation of the Canobie stock, and it would have continued to be so, but for the decision in Maass v. Higgins, supra, and the requirement which that case laid upon these Executors, to which reference has been made.

If the Government had wished to procure the closing agreement referred to in the waiver, it was at all times in a position so to require. The failure in that respect has not been explained.

■ The further point presented by the defendant is the right to offset, against the plaintiffs' claim to refund, something which has not been demonstrated, but which will be assumed to be the difference between the 92½% valuation of the Canobie stock, and the 100% originally claimed in the notice of additional assessment.

Reliance is had upon Bull v. United States, 295 U.S. 247, 55 S.Ct. 695, 79 L.Ed. 1421; Lewis v. Reynolds, 284 U.S. 281, 52 S.Ct. 145, 79 L.Ed. 293; and Tait v. Safe Deposit & Trust Co., 4 Cir., 70 F.2d 79.

In each case it was held that a tax properly assessed may be offset under rather strict rules, against a claim for refund, where it would be inequitable to rule otherwise.

To reach a conclusion favorable to the defendant on this theory, it is necessary to assume or establish: (1) that a 100% would be the proper valuation of the Canobie stock, and (2) that it would therefore be inequitable to allow the plaintiffs here to recover.

So far from being able to perceive anything inequitable in according to these plaintiffs the benefit of the Maass case, supra, I should suppose that the contrary would be true. The necessary impact of that decision is that the regulation under which the post-mortem income was taxed should never have been promulgated. That being so, the Government ought to be the first to consent to undo its own overreaching.

If there is any lack of equity, it is not in the plaintiffs' case.

As to the assumption of the legality of a 100% assessment, I have pointed out that the valuation in the estate of Charles becomes more than a precedent; it becomes an integral part of the valuation in the estate of James.

Testimony, even if it had been tendered in an effort to evade that valuation which was deliberately established by governmental action, could scarcely rise to a perceptible level of persuasion so far as this Court is concerned.

Thus the essential element present in the cases cited in this connection, is absent from this record.

At the adjourned hearing of this cause, the Government moved to amend its Answer by adding a fifth defense in order to allege the terms of the original offer on the part of the five brothers O'Connor to transfer their securities to Canobie Corporation, concerning a provision to the effect that, on the death of any one of them owning not less than 20% of the entire stock, his personal representatives should have the right to call upon the corporation to buy his entire holdings at the then book value (i.e., the value as shown by the current market prices of the securities owned by the corporation) subject to the then prevailing practice of the New York State taxing authorities in fixing values for inheritance tax purposes so to be established. (In these estates it was 90% of the market values of the securities held by Canobie Corporation.) This is the gist of the amendment but not its precise terms.

There being no objection, the defense thus lately pleaded was deemed to be in the record, together with a Reply raising issues in respect thereof.

In that state of the record, Mr. Clark, the attorney who organized the corporation, testified as to the understanding of all the brothers, that, while the contract contained the provision in question, it was the expressed and agreed intention of the five brothers that it was their purpose that it should so operate only for the benefit of one of them (Scott O'Connor) who survived both Charles and James, and that the personal representatives of neither of the latter have sought to assert or enforce such a right in behalf of either of those two brothers. Further, that when the brother who had exacted the agreement as his price for conveying his stocks and bonds to Canobie Corporation died, his personal representatives asserted that right, and it was discharged by turning over to them what was substantially his aliquot share of the various stock-holdings of Canobie Corporation, plus a cash adjustment to equalize figures. Thereafter, by written agreement among the surviving interests in Canobie Corporation, the contract in question was abrogated.

The foregoing was relied upon by the defendant to establish an additional reason why the valuation of James' stock in Canobie Corporation should now be reopened and reestablished.

The argument fails for several reasons:

(1) All of these matters were known to the Bureau at the time that the 92½% valuations of the stock of Charles and James were stipulated and settled; they must therefore have entered into the calculations of those who made the adjustment while the question was pending before the Board of Tax Appeals in connection with the 7,000 shares owned by Charles, one-quarter of which were inherited by James.

(2) By agreement among the brothers, the right of the personal representatives of Scott to put his Canobie stock to the corporation did not enhance the value of the stock of either Charles or James. If anything, it might have tended to lower the intrinsic value of all holdings other than Scott's, for in effect it guaranteed that one-fifth of the combined holdings could indeed

be marketed on a given day, at market quotations, which might have been impossible of performance. To the extent that the corporation might suffer a loss if the stocks representing Scott's participation were forced for sale, it depleted the corporation's funds, and therefore the value of the remaining holdings.

(3) The accepted standard of fixing values was that of the New York State taxing authorities, which was stated to be 90% in the case of the holdings of Charles and James, or 2½% under the Federal Estate tax figures as fixed by negotiation.

It results that the Government has not offered to prove that any tax, even if the proceedings were to be reopened, would be recoverable in excess of what was paid on the negotiated figure of 92½%.

The defenses pleaded in the Answer as amended therefore fail to allege facts upon which the defendant may recover, and judgment is directed in favor of the plaintiffs for $3,466.67, with interest from December 1, 1939.

Findings are filed herewith.