Walter W. **FLORA**, Plaintiff,

v.

The **UNITED STATES** of America, Defendant.

Civ. No. 3916.

United States District Court
D. Wyoming.

July 24, 1956.

A. G. McClintock, Cheyenne, Wyo., for plaintiff.

John F. Raper, U. S. Atty., of Cheyenne, Wyo., and Thomas H. Foye, Atty., U. S. Dept. of Justice, Tax Division, Washington, D. C., for defendant.

KERR, District Judge.

The primary question here is whether losses sustained by taxpayer in 1950, resulting from trading in commodities and commodity futures, were capital losses within the meaning of the term defined by Section 117(a) (1) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 117(a) (1).

The taxpayer by this action seeks to recover payments made by him upon his 1950 income tax which he claims to have been illegally assessed.

Flora, the taxpayer, is a partner in the Flora Engineering Company. In its partnership return of income for 1950 it claimed as ordinary loss the amount of $85,216.10 growing out of transactions in commodities and commodity futures during that year. The loss so claimed was disallowed by the Bureau, thereby resulting in an additional income to taxpayer in the amount of $42,608.05. On March 27, 1953, a deficiency assessment was made against the taxpayer in the amount of $27,251.13. Taxpayer paid the sum of $5,058.54 on said deficiency assessment and this action has for its purpose the recovery of said sum so paid.

The government filed a motion to dismiss this action and as a basis therefor alleged that this Court was without jurisdiction to hear and determine the matter as the complaint showed conclusively on its face that the taxpayer has not paid the *full amount* of the tax deficiency assessed against him.

Historically, it has been the established policy of our tax system for the taxpayer to pay first and litigate afterwards. This is the method of corrective justice consistently followed by the lower courts since the decision of Cheatham v. United States, 92 U.S. 85, 23 L.Ed. 561. Recently, however, in the case of Bushmiaer v. United States, 8 Cir., 230 F.2d 146, at page 149, the Court held: "There is no provision in the revenue act specifically *requiring* the taxpayer to pay the *full amount* of the additional assessment unless that may be inferred from the provision requiring the taxpayer as a condition precedent to his right to maintain a civil action in the District Court to file a claim for refund." The court in reversing the decision of the trial court allowed suit to be maintained where the taxpayer paid the sum of $5,000 on an assessment of $137,987.28.

The Bushmiaer case is in direct conflict with Suhr v. United States, 3 Cir., 18 F.2d 81, at page 83, where the court stated:

"None of the various tax acts provide for recourse to the courts by a taxpayer until he has failed to get relief from the proper administrative body or has *paid all the taxes assessed against him*. The payment of a part does not confer jurisdiction upon the courts. Blair v. United States ex rel. Birkenstock, supra [271 U.S. 348, 46 S.Ct. 506, 70 L.Ed. 983]."

It is important to note that in the Cheatham case the court said, 92 U.S. at page 88:

"So also, in the internal-revenue department, the statute which we have copied allows appeals from the assessor to the commissioner of internal revenue; and, if dissatisfied with his decision, on *paying the tax* the party can sue the collector; and, if the money was wrongfully exacted, the courts will give him relief by a judgment, which the United States pledges herself to pay.

"It will be readily conceded, from what we have here stated, that the

government has the right to prescribe the conditions on which it will subject itself to the judgment of the courts in the collection of its revenues."

And again, 92 U.S. at page 89:

* * * "It is essential to the honor and orderly conduct of the government that its taxes should be promptly paid, and drawbacks speedily adjusted; and the rule prescribed in this class of cases is neither arbitrary nor unreasonable. * * * He can, if the decision is delayed beyond twelve months, rest his case on that decision; or he *can pay the amount claimed,* and commence his suit at any time within that period."

It will be noted that the Court refers to *paying* "the tax" as a prerequisite to suit for recovery. It contemplates a payment of the entire tax assessed and not a token payment for the purpose of obtaining a judicial determination of the unpaid balance prior to the payment of the same.

This principle has been consistently approved by the Supreme Court in the following cases: Kings County Savings Institution v. Blair, 116 U.S. 200, 6 S.Ct. 353, 29 L.Ed. 657; Dodge v. Osborn, 240 U.S. 118, 36 S.Ct. 275, 60 L.Ed. 557; Graham v. Du Pont, 262 U.S. 234, 43 S.Ct. 567, 67 L.Ed. 965; Phillips v. Commissioner, 283 U.S. 589, 51 S.Ct. 608, 75 L.Ed. 1289; United States v. Jefferson Electric Mfg. Co., 291 U.S. 386, 54 S.Ct. 443, 78 L.Ed. 859; Dobson v. Commissioner, 320 U.S. 489, 64 S.Ct. 239, 88 L.Ed. 248.

In 1924 Congress recognized the hardships imposed on taxpayers in being required to pay the tax assessed as a condition precedent to bringing a suit for recovery of the same and established the Board of Tax Appeals (now the United States Tax Court). The Board of Tax Appeals was set up as a place where the validity of an income tax assessment could be litigated prior to the payment of the deficiency assessment. It is important to quote the precise language of the House Committee on Ways and Means when it created the Board of Tax Appeals:

"(H. Rep. No. 179, 68th Cong., 1st Sess., pp. 7–8 (1939–1 Cum.Bull. (Part 2) 241, 246–247)):

"The committee recommends the establishment of a Board of Tax Appeals to which a taxpayer may appeal prior to the payment of an additional assessment of income, excess-profits, war-profits, or estate taxes. Although a taxpayer may, after payment of his tax, bring suit for the recovery thereof and thus secure a judicial determination of the questions involved, he can not, in view of section 3224 of the Revised Statutes, which prohibits suits to enjoin the collection of taxes, secure such a determination prior to the payment of the tax. The right of appeal after payment of the tax is an incomplete remedy, and does little to remove the hardship occasioned by an incorrect assessment. The payment of a large additional tax on income received several years previous and which may have, since its receipt, been either wiped out by subsequent losses, invested in non-liquid assets, or spent, sometimes forces taxpayers into bankruptcy, and often causes great financial hardship and sacrifice. These results are not remedied by permitting the taxpayer to sue for the recovery of the tax after this payment. He is entitled to an appeal and to a determination of his liability for the tax prior to its payment."

■ I have carefully considered the decisions respecting the rights of the taxpayer and it is my reasoned judgment that since the complaint shows on its face that the plaintiff has not paid the entire tax assessment he should not maintain the instant suit. However, since the Third and Eighth Circuits are in conflict on the subject and this Circuit has not had occasion to pass on the matter I deem it advisable to pass upon the merits of the case as the record con-

sists only of a stipulation of facts and a few pages of testimony.

The facts are not in serious dispute, if in dispute at all. The Flora Engineering Company is a family partnership and was formed to engage in the business of engineering and farming; in 1950 the taxpayer acquired seats on both the Chicago Board of Trade and the New Orleans Exchange; the seats were owned by the plaintiff and not by the partnership; taxpayer's trading on these exchanges was done for his own account or for the account of the partnership; he testified that during 1950 he spent 60% to 70% of his time on the floors of these exchanges.

During the year 1950 his total volume of trading in commodity futures was $16,940,000; his total volume of trading in actual commodities for the same year was $322,000; that there were 397 transactions.

He further testified that he maintained an office in Denver, Colorado, in the name of the Flora Engineering Company; that he contacted people by telephone from his office in an attempt to sell actual commodities to them or in some cases people contacted him at his office in an attempt to buy actual commodities.

He did not maintain a board in his office for quoting prices of commodities or commodity futures; neither did he advertise or employ salesmen or customers' men; that his dealings in both commodities and commodity futures were of a speculative nature; that during 1950 he was not engaged in farming, manufacturing, or other activity which would require the use of commodities purchased and sold.

With this evidence in mind I shall try to square the facts in line with decided cases.

Taxpayer has placed some emphasis on Corn Products Refining Co. v. Commissioner, 350 U.S. 46, 76 S.Ct. 20, 23. As I read that opinion the Corn Products was a manufacturer of products made from grain, viz: starch, syrup, sugar and by-products, feed and oil. In sub-stance Mr. Justice Clark stated: * * * "it is difficult to imagine a program more closely geared to a company's manufacturing enterprise or more important to its successful operation." The officers testified in that case that the company was trying to protect a part of its manufacturing cost to fill an actual need for the quantity of corn purchased in order to cover a market over a period of fifteen or eighteen months. I do not think that the Corn Products case is in point.

A rather exhaustive discussion on this subject, together with an interpretation of the revenue act involved can be found in Commissioner of Internal Revenue v. Covington, 5 Cir., 120 F.2d 768. Further light is shed on this subject by the concurring opinion of Judge Holmes. He stated, 120 F.2d at page 771:

"Transactions in commodity futures are commonly spoken of as purchases and sales of a specific commodity such as corn, wheat, or cotton, but the traders really acquire rights to the specific commodity rather than the commodity itself. These rights are intangible property which may appreciate or depreciate in value. They are capital assets held by the taxpayer (whether or not connected with his trade or business), but, unless they are hedges (which are in a class by themselves), they cannot be regarded as stock in trade or other property of a kind which would properly be included in the inventories of the taxpayer if on hand at the close of the taxable year. *Neither are they property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business.*"

The taxpayer's primary interest during 1950 was trading in commodity futures. His greatest volume was in futures. I think his case comes clearly within the rule laid down in Faroll v. Jarecki, 7 Cir., 231 F.2d 281. During the year of 1943 Faroll, the taxpayer, in more than ten thousand separate transactions, personally purchased and

sold as principal on his own account commodity futures involving almost eighty-one million bushels of grain at prices amounting in the aggregate to more than $84,000,000. He averaged at a minimum 41 separate transactions and $340,000 per day. He devoted all of his time to the business of buying and selling in futures. His losses for the year were $136,421.59. The only persons permitted to buy and sell commodity futures on the floor of the Exchange in 1943 and both prior and subsequent thereto were members thereof. Faroll made all his commodity future purchases from other members of the exchange and he made all his sales of commodity futures to other members of the exchange.

On the above evidence the trial court held that the sales were made in the ordinary course of the taxpayer's trade or business. In reversing the decision of the trial court Judge Finnegan stated, 231 F.2d at pages 287–288:

"From the stipulated activities and description of the Board of Trade's operations, we would have to ignore the realities of the market place, to hold otherwise than that Faroll's losses resulted from declines and advances in prices in the market, Chicago Board of Trade, where he daily bought and sold commodity futures on his own behalf. To say all businesses contain an element of speculation is not an answer here. Life itself is a speculation. We also think the inter-member transactions in commodity futures operating in the 'pit' are not, on these facts, sales to customers within the meaning of § 117(a) (1). Even capital assets, uncontroverted in such classification, may be sold to a customer or customers without losing preferential treatment under the Code. Indeed, frequently, that is the tax-wise juncture of realization to the holder of such assets.

\*   \*   \*   \*   \*

"It is evident, and undisputed, that Faroll's transactions were not in the commodity itself. This significant aspect is also brought into further sharp relief by Hoffman's statement: 'Future contracts should \* \* \* be thought of as *rights* to the commodity rather than the commodity itself and in dealing in futures one is dealing not in the actual commodity but in *claims* on or *contracts* for the commodity.' Hoffman, Future Trading 111 (1932). We are aware that Mr. Justice Holmes, speaking for the majority in Board of Trade of City of Chicago v. Christie Grain & Stock Co., 1905, 198 U.S. 236, 250, 25 S.Ct. 637, 639, 49 L.Ed. 1031, where the legality of commodity futures traders was in issue, said: 'A set-off is, in legal effect, a delivery. We speak only of the contracts made in the pits, because in them the members are principals.' Here our concern is not with legality of Faroll's transactions but rather the relations which commodity futures contracts bear to transactions in the actual commodity. Christie describes some of the activities at the Board of Trade, federal income tax law was not there involved."

I cannot distinguish the Faroll case from the situation in the case at bar. The fact that Flora did accept a few commodities and re-sold them to individuals other than fellow brokers does not operate to change the tax treatment of the losses incurred. The taxpayer has produced no authority and I have found none to support the proposition that losses from future trading should be afforded different tax treatment because losses from future trading were accompanied by losses from trading in actual commodities. The trading in actual commodities is a natural incident of future trading.

After a careful examination of the stipulation of facts, the evidence adduced and an exhaustive examination of the authorities I am impelled to hold the losses sustained by Flora were capital losses within the meaning of the term defined by Section 117(a) (1) of the

Internal Revenue Code of 1939. Accordingly plaintiff's prayer for judgment is denied.

Counsel will collaborate and prepare findings of fact and conclusions of law in conformity with this opinion and submit the same, together with judgment, within twenty days from and after the date of this opinion and the clerk will enter an order accordingly.