# FLORA *v.* UNITED STATES.

No. 492, October Term, 1957.   Argued May 20, 1958.—Decided
June 16, 1958.—Rehearing granted June 22, 1959.—Reargued
November 12, 1959.—Decided March 21, 1960.

*Randolph W. Thrower* reargued the cause for petitioner. With him on the brief on reargument were *A. G. McClintock, William A. Sutherland* and *George L. Cohen.*

*Assistant Attorney General Rice* reargued the cause for the United States. With him on the brief on reargument were *Solicitor General Rankin, Harry Baum* and *Marvin W. Weinstein.*

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

The question presented is whether a Federal District Court has jurisdiction under 28 U. S. C. § 1346 (a)(1) of a suit by a taxpayer for the refund of income tax payments which did not discharge the entire amount of his assessment.

This is our second consideration of the case. In the 1957 Term, we decided that full payment of the assessment is a jurisdictional prerequisite to suit, 357 U. S. 63. Subsequently the Court granted a petition for rehearing. 360 U. S. 922. The case has been exhaustively briefed and ably argued. After giving the problem our most careful attention, we have concluded that our original disposition of the case was correct.

Under such circumstances, normally a brief epilogue to the prior opinion would be sufficient to account for our decision. However, because petitioner in reargument has placed somewhat greater emphasis upon certain contentions than he had previously, and because our dissenting colleagues have elaborated upon the reasons for their

disagreement, we deem it advisable to set forth our reasoning in some detail, even though this necessitates repeating much of what we have already said.

## THE FACTS.

The relevant facts are undisputed and uncomplicated. This litigation had its source in a dispute between petitioner and the Commissioner of Internal Revenue concerning the proper characterization of certain losses which petitioner suffered during 1950. Petitioner reported them as ordinary losses, but the Commissioner treated them as capital losses and levied a deficiency assessment in the amount of $28,908.60, including interest. Petitioner paid $5,058.54 and then filed with the Commissioner a claim for refund of that amount. After the claim was disallowed, petitioner sued for refund in a District Court. The Government moved to dismiss, and the judge decided that the petitioner "should not maintain" the action because he had not paid the full amount of the assessment. But since there was a conflict among the Courts of Appeals on this jurisdictional question, and since the Tenth Circuit had not yet passed upon it, the judge believed it desirable to determine the merits of the claim. He thereupon concluded that the losses were capital in nature and entered judgment in favor of the Government. 142 F. Supp. 602. The Court of Appeals for the Tenth Circuit agreed with the district judge upon the jurisdictional issue, and consequently remanded with directions to vacate the judgment and dismiss the complaint. 246 F. 2d 929. We granted certiorari because the Courts of Appeals were in conflict with respect to a question which is of considerable importance in the administration of the tax laws.[1]

---

[1] The decision of the Court of Appeals in *Flora* conflicted with *Bushmiaer* v. *United States*, 230 F. 2d 146 (C. A. 8th Cir.). Cf. *Coates* v. *United States*, 111 F. 2d 609 (C. A. 2d Cir.) ; *Sirian Lamp*

## The Statute.

The question raised in this case has not only raised a conflict in the federal decisions, but has also in recent years provoked controversy among legal commentators.[2] In view of this divergence of expert opinion, it would be surprising if the words of the statute inexorably dictated but a single reasonable conclusion.   Nevertheless, one of the arguments which has been most strenuously urged is that the plain language of the statute precludes, or at the very least strongly militates against, a decision that full payment of the income tax assessment is a jurisdictional condition precedent to maintenance of a refund suit in a District Court.   If this were true, presumably we could but recite the statute and enter judgment for petitioner—though we might be pardoned some perplexity as to how such a simple matter could have caused so much confusion. Regrettably, this facile an approach will not serve.

Section 1346 (a)(1) provides that the District Courts shall have jurisdiction, concurrent with the Court of Claims, of

"(1) Any civil action against the United States for the recovery of *any internal-revenue tax* alleged to have been erroneously or illegally assessed or collected, or *any penalty* claimed to have been collected

Co. v. *Manning*, 123 F. 2d 776 (C. A. 3d Cir.); *Suhr* v. *United States*, 18 F. 2d 81 (C. A. 3d Cir.), *semble*.

[2] As will appear later, prior to 1940 the general view was that full payment was a jurisdictional prerequisite.   But a substantial difference of opinion arose after 1940, when the Court of Appeals for the Second Circuit decided *Coates* v. *United States*, 111 F. 2d 609, against the Government.   See Riordan, Must You Pay Full Tax Assessment Before Suing in the District Court? 8 J. Tax. 179; Beaman, When Not to Go to the Tax Court: Advantages and Procedures in Going to the District Court, 7 J. Tax. 356; Rudick and Wender, Federal Income Taxation, 32 N. Y. U. L. Rev. 751, 777–778; Note, 44 Calif. L. Rev. 956; Note, 2 How. L. J. 290.

without authority or *any sum* alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws . . . ." (Emphasis added.)

It is clear enough that the phrase "any internal-revenue tax" can readily be construed to refer to payment of the entire amount of an assessment. Such an interpretation is suggested by the nature of the income tax, which is "*A* tax . . . imposed for each taxable year," with the "amount of *the* tax" determined in accordance with prescribed schedules.[3] (Emphasis added.) But it is argued that this reading of the statute is foreclosed by the presence in § 1346 (a)(1) of the phrase "any sum." This contention appears to be based upon the notion that "any sum" is a catchall which confers jurisdiction to adjudicate suits for refund of part of a tax. A catchall the phrase surely is; but to say this is not to define what it catches. The sweeping role which petitioner assigns these words is based upon a conjunctive reading of "any internal-revenue tax," "any penalty," and "any sum." But we believe that the statute more readily lends itself to the disjunctive reading which is suggested by the connective "or." That is, "any sum," instead of being related to "any internal-revenue tax" and "any penalty," may refer to amounts which are neither taxes nor penalties. Under this interpretation, the function of the phrase is to permit suit for recovery of items which might not be designated as either "taxes" or "penalties" by Congress or the courts. One obvious example of such a "sum" is interest. And it is significant that many old tax statutes described the amount which was to be assessed under certain circumstances as a "sum" to be added to the tax, simply as a

---

[3] See I. R. C. (1954), §§ 1 (a), 1 (b) (1), 68A Stat. 5, 6. The same general pattern has existed for many years. See, *e. g.*, §§ 116, 117, of the Act of June 30, 1864, c. 173, 13 Stat. 281–282.

"sum," as a "percentum," or as "costs."[4] Such a rendition of the statute, which is supported by precedent,[5] frees the phrase "any internal-revenue tax" from the qualifications imposed upon it by petitioner and permits it to be given what we regard as its more natural reading—the full tax. Moreover, this construction, under which each phrase is assigned a distinct meaning, imputes to Congress a surer grammatical touch than does the alternative interpretation, under which the "any sum" phrase completely assimilates the other two. Surely a much clearer statute could have been written to authorize suits for refund of any part of a tax merely by use of the phrase "a tax or any portion thereof," or simply "any sum paid under the internal revenue laws." This Court naturally does not review congressional enactments as a panel of grammarians; but neither do we regard ordinary principles of English prose as irrelevant to a construction of those enactments. Cf. *Commissioner* v. *Acker,* 361 U. S. 87.

We conclude that the language of § 1346 (a)(1) can be more readily construed to require payment of the full tax before suit than to permit suit for recovery of a part

---

[4] Revenue Act of 1924, c. 234, § 275 (a), 43 Stat. 298; Revenue Act of 1918, c. 18, § 250 (e), 40 Stat. 1084; Act of June 6, 1872, c. 315, § 21, 17 Stat. 246; Act of June 30, 1864, c. 173, § 119, 13 Stat. 283. See also *Helvering* v. *Mitchell,* 303 U. S. 391, 405.

[5] Lower courts have given this construction to the same three phrases in certain claim-for-refund and limitations provisions in prior tax statutes. *United States* v. *Magoon,* 77 F. 2d 804; *Union Trust Co.* v. *United States,* 5 F. Supp. 259, 261 ("The natural definition of 'tax' comprehends one 'assessment' or one tax in the entire amount of liability"), aff'd, 70 F. 2d 629, 630 ("We agree with the District Court that 'tax,' 'penalty,' and 'sum' refer to distinct categories of illegal collections and 'tax' includes the entire tax liability as assessed by the Commissioner"); *United States* v. *Clarke,* 69 F. 2d 748; *Hills* v. *United States,* 50 F. 2d 302, 55 F. 2d 1001 (Ct. Cl.); cf. *Blair* v. *Birkenstock,* 271 U. S. 348.

payment. But, as we recognized in the prior opinion, the statutory language is not absolutely controlling, and consequently resort must be had to whatever other materials might be relevant.[6]

### LEGISLATIVE HISTORY AND HISTORICAL BACKGROUND.

Although frequently the legislative history of a statute is the most fruitful source of instruction as to its proper interpretation, in this case that history is barren of any clue to congressional intent.

The precursor of § 1346 (a)(1) was § 1310 (c) of the Revenue Act of 1921,[7] in which the language with which we are here concerned appeared for the first time in a jurisdictional statute. Section 1310 (c) had an overt purpose unrelated to the question whether full payment of an assessed tax was a jurisdictional prerequisite to a suit for refund. Prior to 1921, tax refund suits against the United States could be maintained in the District Courts under the authority of the Tucker Act, which had been passed in 1887.[8] Where the claim exceeded $10,000, however, such a suit could not be brought, and in such a situation the taxpayer's remedy in District Court was against the Collector.

---

[6] In the prior opinion we stated that, were it not for certain countervailing considerations, the statutory language "might . . . be termed a clear authorization" to sue for the refund of part payment of an assessment. 357 U. S., at 65. It is quite obvious that we did not regard the language as clear enough to preclude deciding the case on other grounds. Moreover, it could at that time be assumed that the terms of the statute favored the taxpayer, because eight members of the Court considered the extrinsic evidence alone sufficient to decide the case against him. Although we are still of that opinion, we now state our views with regard to the bare words of the statute because the argument that these words are decisively against the Government has been urged so strenuously.

[7] 42 Stat. 311.

[8] 24 Stat. 505, as amended, 28 U. S. C. §§ 1346, 1491. See *United States* v. *Emery, Bird, Thayer Realty Co.*, 237 U. S. 28.

But because the Collector had to be sued personally, no District Court action was available if he was deceased.[9] The 1921 provision, which was an amendment to the Tucker Act, was explicitly designed to permit taxpayers to sue the United States in the District Courts for sums exceeding $10,000 where the Collector had died.[10]

The ancestry of the language of § 1346 (a)(1) is no more enlightening than is the legislative history of the 1921 provision. This language, which, as we have stated, appeared in substantially its present form in the 1921 amendment, was apparently taken from R. S. § 3226 (1878). But § 3226 was not a jurisdictional statute at all; it simply specified that suits for recovery of taxes, penalties, or sums could not be maintained until after a claim for refund had been submitted to the Commissioner.[11]

Thus there is presented a vexing situation—statutory language which is inconclusive and legislative history which is irrelevant. This, of course, does not necessarily mean that § 1346 (a)(1) expresses no congressional intent with respect to the issue before the Court; but it does make that intent uncommonly difficult to divine.

It is argued, however, that the puzzle may be solved through consideration of the historical basis of a suit to recover a tax illegally assessed. The argument proceeds as follows: A suit to recover taxes could, before the Tucker

---

[9] *Smietanka* v. *Indiana Steel Co.*, 257 U. S. 1.

[10] See H. R. Conf. Rep. No. 486, 67th Cong., 1st Sess. 57; remarks of Senator Jones, 61 Cong. Rec. 7506–7507. Another amendment was added in 1925 giving the right to bring refund suits against the United States where the Collector was out of office. 43 Stat. 972. And in 1954, both the $10,000 limitation and the limitation with respect to the Collector being dead or out of office were eliminated. 68 Stat. 589.

[11] The text of R. S. § 3226 is set forth in note 16, *infra,* together with a more detailed account of the origin and development of the pertinent statutory language. The successor of R. S. § 3226 is I. R. C. (1954), § 7422 (a), 68A Stat. 876.

Act, be brought only against the Collector. Such a suit was based upon the common-law count of assumpsit for money had and received, and the nature of that' count requires the inference that a suit for recovery of part payment of a tax could have been maintained. Neither the Tucker Act nor the 1921 amendment indicates an intent to change the nature of the refund action in any pertinent respect. Consequently, there is no warrant for importing into § 1346 (a)(1) a full-payment requirement.

For reasons which will appear later, we believe that the conclusion would not follow even if the premises were clearly sound. But in addition we have substantial doubt about the validity of the premises. As we have already indicated, the language of the 1921 amendment does in fact tend to indicate a congressional purpose to require full payment as a jurisdictional prerequisite to suit for refund. Moreover, we are not satisfied that the suit against the Collector was identical to the common-law action of assumpsit for money had and received. One difficulty is that, because of the Act of February 26, 1845, c. 22, 5 Stat. 727, which restored the right of action against the Collector after this Court had held that it had been implicitly eliminated by other legislation,[12] the Court no longer regarded the suit as a common-law action, but rather as a statutory remedy which "in its nature [was] a remedy against the Government." *Curtis's Administratrix* v. *Fiedler,* 2 Black 461, 479. On the other hand, it is true that none of the statutes relating to this type of suit clearly indicate a congressional intention to require full payment of the assessed tax before suit.[13] Nevertheless, the opinion of this Court in *Cheatham* v. *United States,* 92 U. S. 85, prevents us from accepting the

[12] See *Cary* v. *Curtis,* 3 How. 236.

[13] *E. g.,* Act of Feb. 26, 1845, c. 22, 5 Stat. 727; Act of Mar. 3, 1863, c. 74, 12 Stat. 729; Act of June 30, 1864, c. 173, § 44, 13 Stat. 239–240.

analogy between the statutory action against the Collector and the common-law count. In this 1875 opinion, the Court described the remedies available to taxpayers as follows:

"So also, in the internal-revenue department, the statute which we have copied allows appeals from the assessor to the commissioner of internal revenue; and, if dissatisfied with his decision, *on paying the tax* the party can sue the collector; and, if the money was wrongfully exacted, the courts will give him relief by a judgment, which the United States pledges herself to pay.

.    .    .    .    .

". . . While a free course of remonstrance and appeal is allowed within the departments before the money is finally exacted, the general government has wisely made *the payment of the tax claimed,* whether of customs or of internal revenue, a condition precedent to a resort to the courts by the party against whom the tax is assessed. . . . If the compliance with this condition [that appeal must be made to the Commissioner and suit brought within six months of his decision] requires the party aggrieved to pay the money, he must do it. He cannot, after the decision is rendered against him, protract the time within which he can contest that decision in the courts by his own delay in paying the money. It is essential to the honor and orderly conduct of the government that its taxes should be promptly paid, and drawbacks speedily adjusted; and the rule prescribed in this class of cases is neither arbitrary nor unreasonable. . . .

"The objecting party can take his appeal. He can, if the decision is delayed beyond twelve months,

rest his case on that decision; or he can *pay the amount claimed,* and commence his suit at any time within that period. So, after the decision, he can pay at once, and commence suit within the six months . . . ." 92 U. S., at 88–89. (Emphasis added.)

Reargument has not changed our view that this language reflects an understanding that full payment of the tax was a prerequisite to suit. Of course, as stated in our prior opinion, the *Cheatham* statement is dictum; but we reiterate that it appears to us to be "carefully considered dictum." 357 U. S., at 68. Equally important is the fact that the Court was construing the claim-for-refund statute from which, as amended, the language of § 1346 (a)(1) was presumably taken.[14] Thus it seems that in *Cheatham* the Supreme Court interpreted this language not only to specify which claims for refund must first be presented for administrative reconsideration, but also to constitute an additional qualification upon the statutory right to sue the Collector. It is true that the version of the provision involved in *Cheatham* contained only the phrase "any tax." But the phrases "any penalty" and "any sum" were added well before the decision in *Cheatham;*[15] the history of these amendments makes it quite clear that they were not designed to effect any change relevant to the *Cheatham* rule;[16] language in

---

[14] See note 16, *infra.*

[15] *Cheatham* was decided in O. T. 1875, while the phrases in question were added to the statute on June 6, 1872. See note 16, *infra,* for a discussion of the statute involved in *Cheatham* and its amendment.

[16] Section 19 of the Act of July 13, 1866, c. 184, 14 Stat. 152, was involved in *Cheatham.* That section provided:

"Sec. 19. . . . [N]o suit shall be maintained in any court for the recovery of any tax alleged to have been erroneously or illegally

opinions of this Court after *Cheatham* is consistent with the *Cheatham* statement; [17] and in any event, as we have indicated, we can see nothing in these additional words which would negate the full-payment requirement.

---

assessed or collected, until appeal shall have been duly made to the commissioner of internal revenue . . . ."

The phrases "any penalty" and "any sum" were first introduced into the statute in § 44 of the Act of June 6, 1872, c. 315, 17 Stat. 257–258, which read as follows:

"Sec. 44. That all suits and proceedings for the recovery of *any internal tax* alleged to have been erroneously assessed or collected, *or any penalty* claimed to have been collected without authority, *or for any sum* which it is alleged was excessive, or in any manner wrongfully collected, shall be brought within two years next after the cause of action accrued and not after; and all claims for the refunding of *any internal tax or penalty* shall be presented to the commissioner of internal revenue within two years next after the cause of action accrued and not after . . . ." (Emphasis added.)

A careful reading of this statute discloses the absurd result which would flow from construing the addition of the "any sum" language to affect the full-payment rule, which, under this argument, would be based upon the "any tax" phrase in the 1866 statute. That is, since the "any sum" phrase occurs only in the statute of limitations portion of the 1872 statute, and not in the claim-for-refund provision, a person would be able to bring a suit for part payment without filing a claim for refund.

There were no material changes in R. S. § 3226, which provided:

"Sec. 3226. No suit shall be maintained in any court for the recovery of any internal tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until appeal shall have been duly made to the Commissioner of . . . Internal Revenue . . . ."

It is no doubt true, as petitioner says, that these various amendments were designed to require submission of all litigable claims to the Commissioner; but, as we have explained, this indicates no more than an intent to cover taxes, penalties, and sums which might, strictly speaking, be neither taxes nor penalties.

[17] *Kings County Savings Institution* v. *Blair*, 116 U. S. 200, 205 (1886) ("No claim for the refunding of taxes can be made according

If this were all the material relevant to a construction of § 1346 (a)(1), determination of the issue at bar would be inordinately difficult. Favoring petitioner would be the theory that, in the early nineteenth century, a suit for recovery of part payment of an assessment could be maintained against the Collector, together with the absence of any conclusive evidence that Congress has ever intended to inaugurate a new rule; favoring respondent would be the *Cheatham* statement and the language of the 1921 statute. There are, however, additional factors which are dispositive.

We are not here concerned with a single sentence in an isolated statute, but rather with a jurisdictional provision which is a keystone in a carefully articulated and quite complicated structure of tax laws. From these related statutes, all of which were passed after 1921, it is apparent that Congress has several times acted upon the assumption that § 1346 (a)(1) requires full payment before suit. Of course, if the clear purpose of Congress at any time had been to permit suit to recover a part payment, this subsequent legislation would have to be disregarded. But, as we have stated, the evidence pertaining to this intent

---

to law and the regulations until after the taxes have been paid. . . . [N]o suit can be maintained for taxes illegally collected unless a claim therefor has been made within the time prescribed by the law"); *Pollock* v. *Farmers' Loan & Trust Co.,* 157 U. S. 429, 609 (1895) (dissenting opinion) ("The same authorities [including the *Cheatham* case] have established the rule that the proper course, in a case of illegal taxation, is to pay the tax under protest or with notice of suit, and then bring an action against the officer who collected it"); *Bailey* v. *George,* 259 U. S. 16, 20. (1922) ("They might have paid the amount assessed under protest and then brought suit against the Collector . . . ."). This view of *Cheatham* also corresponds to that of the Court of Appeals in this case. 246 F. 2d, at 930. See also *Bushmiaer* v. *United States,* 230 F. 2d 146, 152–155 (dissenting opinion).

is extremely weak, and we are convinced that it is entirely too insubstantial to justify destroying the existing harmony of the tax statutes. The laws which we consider especially pertinent are the statute establishing the Board of Tax Appeals (now the Tax Court), the Declaratory Judgment Act, and § 7422 (e) of the Internal Revenue Code of 1954.

## THE BOARD OF TAX APPEALS.

The Board of Tax Appeals was established by Congress in 1924 to permit taxpayers to secure a determination of tax liability before payment of the deficiency.[18] The Government argues that the Congress which passed this 1924 legislation thought full payment of the tax assessed was a condition for bringing suit in a District Court; that Congress believed this sometimes caused hardship; and that Congress set up the Board to alleviate that hardship. Petitioner denies this, and contends that Congress' sole purpose was to enable taxpayers to prevent the Government from collecting taxes by exercise of its power of distraint.[19]

We believe that the legislative history surrounding both the creation of the Board and the subsequent revisions of the basic statute supports the Government. The House Committee Report, for example, explained the purpose of the bill as follows:

"The committee recommends the establishment of a Board of Tax Appeals to which a taxpayer may appeal *prior to the payment* of an additional assessment of income, excess-profits, war-profits, or estate taxes. *Although a taxpayer may, after payment of*

---

[18] 43 Stat. 336.

[19] I. R. C. (1954), § 6331, 68A Stat. 783. The Government has possessed the power of distraint for almost 170 years. See Act of Mar. 3, 1791, c. 15, § 23, 1 Stat. 204.

*his tax, bring suit for the recovery thereof* and thus secure a judicial determination on the questions involved, he can not, in view of section 3224 of the Revised Statutes, which prohibits suits to enjoin the collection of taxes, secure such a determination prior to the payment of the tax. The right of appeal after payment of the tax is an incomplete remedy, and does little to remove the hardship occasioned by an incorrect assessment. The payment of a large additional tax on income received several years previous and which may have, since its receipt, been either wiped out by subsequent losses, invested in nonliquid assets, or spent, sometimes forces taxpayers into bankruptcy, and often causes great financial hardship and sacrifice. These results are not remedied by permitting the taxpayer *to sue for the recovery of the tax after this payment.* He is entitled to an appeal and to a determination of his liability for the tax prior to its payment." [20] (Emphasis added.)

Moreover, throughout the congressional debates are to be found frequent expressions of the principle that payment of the full tax was a precondition to suit: "pay his tax . . . then . . . file a claim for refund"; "pay the tax and then sue"; "a review in the courts after payment of the tax"; "he may still seek court review, but he must first pay the tax assessed"; "in order to go to court he must pay his assessment"; "he must pay it [his assess-

---

[20] H. R. Rep. No. 179, 68th Cong., 1st Sess. 7. The Senate Committee on Finance filed a similar report. S. Rep. No. 398, 68th Cong., 1st Sess. 8.

The reference to R. S. § 3224 in the House Report clearly was meant simply to demonstrate that a determination prior to payment by way of an injunction suit was not possible because of the statutory bar to such a suit. This anti-injunction provision has been law for many decades. See Act of Mar. 2, 1867, c. 169, § 10, 14 Stat. 475. It is now § 7421 of the Internal Revenue Code of 1954, 68A Stat. 876.

ment] before he can have a trial in court"; "pay the taxes adjudicated against him, and then commence a suit in a court"; "pay the tax . . . [t]hen . . . sue to get it back"; "paying his tax and bringing his suit"; "first pay his tax and then sue to get it back"; "take his case to the district court—conditioned, of course, upon his paying the assessment." [21]

Petitioner's argument falls under the weight of this evidence. It is true, of course, that the Board of Tax Appeals procedure has the effect of staying collection,[22] and it may well be that Congress so provided in order to alleviate hardships caused by the long-standing bar against suits to enjoin the collection of taxes. But it is a considerable leap to the further conclusion that amelioration of the hardship of prelitigation payment as a jurisdictional requirement was not another important

---

[21] See 65 Cong. Rec. 2621, 2684, 8110; 67 Cong. Rec. 525, 1144, 3529, 3755.

As we have indicated, some of these remarks were made during debates over proposed changes in the Board of Tax Appeals legislation during the middle of the 1920's, but they all reflect Congress' understanding of the pre-1924 procedure and of the changes which were made by establishment of the Board. For example, shortly after the Board legislation was passed, Congress considered and rejected a proposal to make appeal to the Board and then to a Circuit Court of Appeals the taxpayer's sole remedy. In the course of the debate, a number of Senators discussed at length the taxpayer's right to bring a refund action in court. Some of the cited quotations are taken from that debate. The following remark of Senator Fletcher is also illuminating:

"Mr. FLETCHER. . . . I think the most important right that is preserved here . . . is the right to go into the district court by the taxpayer upon the payment of the tax. *I do not think that we ought to allow him to do that unless he does pay the tax; but when he pays the tax his right to go into the district court is preserved."* 67 Cong. Rec. 3529. (Emphasis added.)

See also the materials quoted in note 24, *infra.*

[22] See I. R. C. (1954), § 6213 (a), 68A Stat. 771. For the pertinent 1924 legislation, see Revenue Act of 1924, c. 234, § 274, 43 Stat. 297.

motivation for Congress' action.[23]   To reconcile the legis-
lative history with this conclusion seems to require the
presumption that all the Congressmen who spoke of
payment of the assessment before suit as a hardship
understood—without saying—that suit could be brought
for whatever part of the assessment had been paid, but
believed that, as a practical matter, hardship would none-
theless arise because the Government would require pay-
ment of the balance of the tax by exercising its power of
distraint.   But if this was in fact the view of these legis-
lators, it is indeed extraordinary that they did not say so.[24]

---

[23] In *Old Colony Trust Co.* v. *Commissioner*, 279 U. S. 716, 721,
this Court expressed the view that the Board "was created by Con-
gress to provide taxpayers an opportunity to secure an independent
review . . . in advance of their paying the tax found by the Com-
missioner to be due.   Before the Act of 1924 the taxpayer could only
contest the Commissioner's determination of the amount of the tax
after its payment."

[24] There are a few interchanges among Senators which might
be construed to indicate that they were thinking in terms of pre-
venting distraint; but the same passages demonstrate even more
clearly that these Senators also intended to eliminate the neces-
sity of full payment as a prerequisite to suit.   For example, the
following debate occurred when Senator Reed, who was a member
of the Committee on Finance, proposed an amendment which would
have permitted a taxpayer to refuse to pay the deficiency even after
the Board had ruled against him and which would have required
the Government to sue in a District Court.

"Mr. REED of Missouri. . . .

.            .            .            .            .

"The practice, as I understand it, has been to require the taxpayer
to pay in the amount of the increased assessment, and then to allow
him to get it back if he can.   In addition to this, distraints frequently
have been issued seizing the property of the citizen . . . .

.            .            .            .            .

"Mr. SWANSON.   What are the processes by which a citizen who
has overpaid can get back his money under the existing law?

"Mr. REED of Missouri.   As I understand it, he pays his tax.
Then he makes an application for a return of it.   That is heard

Moreover, if Congress' only concern was to prevent distraint, it is somewhat difficult to understand why Congress did not simply authorize injunction suits. It is interesting to note in this connection that bills to permit the same type of prepayment litigation in the District Courts as is

through the long, troublesome processes which exist . . . . When the Treasury is satisfied . . . the taxpayer can go into court at that time. In the meantime, however, he has had to pay his money.

.      .      .      .      .

"Mr. SWANSON. Does the Senator mean that if there is a dispute, the tax is not assessed permanently against him until the board reaches its final decision?

"Mr. SMOOT. Until the board of appeals finally passes upon it, and after that if he wants to go to court he can do so, but in order to go to court he must pay his assessment.

"Mr. REED of Missouri. He must pay it before he can have a trial in court.

.      .      .      .      .

"Mr. WALSH of Montana. Mr. President, the hardships . . . in connection with the collection of these taxes is a very real one. . . . At least two or three instances have come under my notice, and my assistance has been asked in cases where the assessing officers have . . . assessed against the [taxpayer] delinquent taxes of such an amount that he found it impossible to pay in advance and secure redress through the ordinary proceeding in a court of law, simply because it would bankrupt him to endeavor to raise the money. He was therefore obliged to suffer a distraint. . . .

.      .      .      .      .

". . . After the board of review determines the matter, it seems to me, that is as far as the Government ought to be interrupted in the matter of the collection of its revenues. Then the taxpayer would be obliged to pay the tax and take his ordinary action at law to recover whatever he claims was exacted of him illegally." 65 Cong. Rec. 8109–8114.

A somewhat similar exchange occurred during the 1926 debate over a proposal to prohibit refund suits where an appeal had been taken to the Board.

"Mr. REED of Missouri. . . . Now just one further question:

"Why is it that a taxpayer can not be given his day in court by direct action, without first requiring him to pay the tax that is assessed? I know I shall be met with the statement that it would

possible in the Tax Court have been introduced several times, but none has ever been adopted.[25]

In sum, even assuming that one purpose of Congress in establishing the Board was to permit taxpayers to avoid distraint, it seems evident that another purpose was to furnish a forum where full payment of the assessment would not be a condition precedent to suit. The result is a system in which there is one tribunal for prepayment litigation and another for post-payment litigation, with no room contemplated for a hybrid of the type proposed by petitioner.

---

mean interminable delay to the Government; but it frequently happens that the tax that is assessed is ruinous, and that the taxpayer can not raise the money. . . .

.        .        .        .        .

"In my own personal experience I have had two clients who were absolutely ruined by assessments that were unjust and that could not have stood up in a court of justice. . . .   [A]nd it was no protection to them to say, 'Pay your taxes and then go into court,' because they did not have the money to pay the taxes and could not raise the money to pay the taxes and be out of the money two or three years.

.        .        .        .        .

". . . I think the bill needs just one more amendment in this particular, and that is a provision that any citizen can go into court without paying any tax and resist the payment. In the meantime I agree that the Government for its own protection ought to be allowed, perhaps, in such a case as that to issue a distraint. But the idea that a man must first pay his money and then sue to get it back is anomaly in the law."   67 Cong. Rec. 3530–3533.

Senator Reed later proposed that the appeal from the Board be to the District Court instead of to the Circuit Court of Appeals, and Senator Wadsworth, a member of the Finance Committee, asked:

"Does the Senator not think that other provision in the bill which permits the taxpayer to take his case to the district court—conditioned, of course, upon his paying the assessment—meets the situation?"   67 Cong. Rec. 3755.

[25] S. 1569, 81st Cong., 1st Sess.; S. 384, 82d Cong., 1st Sess.; H. R. 150 and H. R. 246, 83d Cong., 1st Sess.

## THE DECLARATORY JUDGMENT ACT.

The Federal Declaratory Judgment Act of 1934 [26] was amended by § 405 of the Revenue Act of 1935 expressly to except disputes "with respect to Federal taxes." [27] The Senate Report explained the purpose of the amendment as follows:

> "Your committee has added an amendment making it clear that the Federal Declaratory Judgments Act of June 14, 1934, has no application to Federal taxes. The application of the Declaratory Judgments Act to taxes would constitute a *radical departure* from the long-continued policy of Congress (as expressed in Rev. Stat. 3224 and other provisions) with respect to the determination, assessment, and collection of Federal taxes. Your committee believes that the orderly and prompt determination and collection of Federal taxes should not be interfered with by a procedure designed to facilitate the settlement of private controversies, and that existing procedure both in the Board of Tax Appeals and the courts affords ample remedies for the correction of tax errors." [28]  (Emphasis added.)

It is clear enough that one "radical departure" which was averted by the amendment was the potential circumvention of the "pay first and litigate later" rule by way of suits for declaratory judgments in tax cases. [29]  Peti-

---

[26] 48 Stat. 955, as amended, 28 U. S. C. §§ 2201, 2202.

[27] 49 Stat. 1027.

[28] S. Rep. No. 1240, 74th Cong., 1st Sess. 11.

[29] "Should the Declaratory Judgment Act be held to apply to tax cases it will mean a complete reversal of our present scheme of taxation. The principle of 'pay first and litigate later' will be changed to 'litigate first and pay later.' This principle has never before been departed from." Wideman, Application of the Declaratory Judgment Act to Tax Suits, 13 Taxes 539, 540.

tioner would have us give this Court's imprimatur to precisely the same type of "radical departure," since a suit for recovery of but a part of an assessment would determine the legality of the balance by operation of the principle of collateral estoppel. With respect to this unpaid portion, the taxpayer would be securing what is in effect—even though not technically—a declaratory judgment. The frustration of congressional intent which petitioner asks us to endorse could hardly be more glaring, for he has conceded that his argument leads logically to the conclusion that payment of even $1 on a large assessment entitles the taxpayer to sue—a concession amply warranted by the obvious impracticality of any judicially created jurisdictional standard midway between *full* payment and *any* payment.

### Section 7422 (e) of the 1954 Code.

One distinct possibility which would emerge from a decision in favor of petitioner would be that a taxpayer might be able to split his cause of action, bringing suit for refund of part of the tax in a Federal District Court and litigating in the Tax Court with respect to the remainder. In such a situation the first decision would, of course, control. Thus if for any reason a litigant would prefer a District Court adjudication,[30] he might sue for a small portion of the tax in that tribunal while at the same time protecting the balance from distraint by invoking the protection of the Tax Court procedure. On the other hand, different questions would arise if this device were not employed. For example, would the Government be required to file a compulsory counterclaim for the unpaid

---

[30] For some practitioners' views on the desirability of litigating tax cases in Federal District Courts, see Dockery, Refund Suits in District Courts, 31 Taxes 523; Yeatman, Tax Controversies, 10 Tex. B. J. 9.

balance in District Court under Rule 13 of the Federal Rules of Civil Procedure? If so, which party would have the burden of proof? [31]

Section 7422 (e) of the 1954 Internal Revenue Code makes it apparent that Congress has assumed these problems are nonexistent except in the rare case where the taxpayer brings suit in a District Court and the Commissioner then notifies him of an additional deficiency. Under § 7422 (e) such a claimant is given the option of pursuing his suit in the District Court or in the Tax Court, *but he cannot litigate in both.* Moreover, if he decides to remain in the District Court, the Government may—but seemingly is not required to—bring a counterclaim; and if it does, the taxpayer has the burden of proof. [32] If we

---

[31] These problems have already occurred to the bar. See Riordan, Must You Pay Full Tax Assessment Before Suing in the District Court? 8 J. Tax. 179, 181.

[32] "§ 7422. CIVIL ACTIONS FOR REFUND.

. . . . .

"(e) STAY OF PROCEEDINGS.—If the Secretary or his delegate prior to the hearing of a suit brought by a taxpayer in a district court or the Court of Claims for the recovery of any income tax, estate tax, or gift tax (or any penalty relating to such taxes) mails to the taxpayer a notice that a deficiency has been determined in respect of the tax which is the subject matter of taxpayer's suit, the proceedings in taxpayer's suit shall be stayed during the period of time in which the taxpayer may file a petition with the Tax Court for a redetermination of the asserted deficiency, and for 60 days thereafter. If the taxpayer files a petition with the Tax Court, the district court or the Court of Claims, as the case may be, shall lose jurisdiction of taxpayer's suit to whatever extent jurisdiction is acquired by the Tax Court of the subject matter of taxpayer's suit for refund. If the taxpayer does not file a petition with the Tax Court for a redetermination of the asserted deficiency, the United States may counterclaim in the taxpayer's suit, or intervene in the event of a suit as described in subsection (c) (relating to suits against officers or employees of the United States), within the period of the stay of proceedings notwithstanding that the time for such pleading may have

were to overturn the assumption upon which Congress has acted, we would generate upon a broad scale the very problems Congress believed it had solved.[33]

These, then, are the basic reasons for our decision, and our views would be unaffected by the constancy or inconstancy of administrative practice. However, because the petition for rehearing in this case focused almost exclusively upon a single clause in the prior opinion—"there does not appear to be a single case before 1940 in which a taxpayer attempted a suit for refund of income taxes without paying the full amount the Government alleged to be due," 357 U. S., at 69—we feel obliged to comment upon the material introduced upon reargument. The

---

otherwise expired. The taxpayer shall have the burden of proof with respect to the issues raised by such counterclaim or intervention of the United States except as to the issue of whether the taxpayer has been guilty of fraud with intent to evade tax. This subsection shall not apply to a suit by a taxpayer which, prior to the date of enactment of this title, is commenced, instituted, or pending in a district court or the Court of Claims for the recovery of any income tax, estate tax, or gift tax (or any penalty relating to such taxes)." 68A Stat. 877.

The possibility of dual jurisdiction in this type of situation was confirmed by cases such as *Camp* v. *United States*, 44 F. 2d 126, and *Ohio Steel Foundry Co.* v. *United States*, 69 Ct. Cl. 158, 38 F. 2d 144. See H. R. Rep. No. 1337, 83d Cong., 2d Sess. 109, A431; S. Rep. No. 1662, 83d Cong., 2d Sess. 148, 610.

[33] For additional evidence of recent congressional understanding of the jurisdictional requirement of § 1346 (a) (1), see the House Report which explained the 1954 amendment abolishing the $10,000 limitation on tax suits against the United States, 68 Stat. 589. After explaining the taxpayer's right to contest a deficiency in the Tax Court, the report states: "The taxpayer may, however, elect to pay his tax and thereafter bring suit to recover the amount claimed to have been illegally exacted." H. R. Rep. No. 659, 83d Cong., 1st Sess. 2.

reargument has, if anything, strengthened, rather than weakened, the substance of this statement, which was directed to the question whether there has been a consistent understanding of the "pay first and litigate later" principle by the interested government agencies and by the bar.

So far as appears, *Suhr* v. *United States,* 18 F. 2d 81, decided by the Third Circuit in 1927, is the earliest case in which a taxpayer in a refund action sought to contest an assessment without having paid the full amount then due.[34] In holding that the District Court had no jurisdiction of the action, the Court of Appeals said:

> "None of the various tax acts provide for recourse to the courts by a taxpayer until he has failed to get relief from the proper administrative body or has paid all the taxes assessed against him. The payment of a part does not confer jurisdiction upon the courts. . . . There is no provision for refund to the taxpayer of any excess payment of any installment or part of his tax, if the whole tax for the year has not been paid." *Id.,* at 83.

---

[34] Petitioner cites two earlier cases in which the Government failed to raise the jurisdictional issue. *Bowers* v. *Kerbaugh-Empire Co.,* 271 U. S. 170 (1926); *Cook* v. *Tait,* 265 U. S. 47 (1924). The Government distinguishes these cases on the ground that, although the total tax for the year had not been paid, the full amount due at the time of suit had been paid. This situation occurred because under § 250 (a) of the Revenue Act of 1921, c. 136, 42 Stat. 264, the tax was paid in four installments, and the plaintiffs in *Cook* and *Bowers* apparently had paid the due installments. While we do not suggest that the statute will support this type of distinction, adoption of it by the Government or by the bar would not in any way impair the substantial consistency of the view that full payment has for many decades been a prerequisite to suit in District Court. An error as to the applicability of a principle to a unique factual situation does not mean that the principle itself has been rejected.

Although the statement by the court might have been dictum,[35] it was in accord with substantially contemporaneous statements by Secretary of the Treasury A. W. Mellon, by Under Secretary of the Treasury Garrard B. Winston, by the first Chairman of the Board of Tax Appeals, Charles D. Hamel, and by legal commentators.[36]

---

[35] The ground for the decision may have been that the District Court had no jurisdiction because the taxpayer was contesting the legality of the balance of the assessment before the Board of Tax Appeals.

[36] In welcoming the members of the Board of Tax Appeals on July 16, 1924, Under Secretary Winston described the difficulties which had arisen in the past.

". . . Under the law a tax once assessed had to be paid by the taxpayer and then his remedy was to sue for its recovery. He must first find the cash for a liability for which he may not have provided. . . . The first interest of all of the people is, of course, that the Government continue to function, and to do this it must have the means of prompt collection of the necessary supplies to keep it going, that is, taxes. The method was, therefore, the determination by the Commissioner of the amount of tax due, its collection and suit to recover. . . . [T]he tax as assessed had to be paid and the taxpayer was left to his remedy in the courts. The payment of the tax was often a great hardship on the taxpayer, meaning in general that he had to raise the cash for an unexpected liability which might not be lawfully due." Treas. Dept. Press Release, July 16, 1924. See also remarks by Under Secretary Winston in addressing the Seventeenth Annual Conference of the National Tax Association in September 1924, Proceedings of Seventeenth National Conference 271.

In commenting upon the Board of Tax Appeals legislation, which contemplated leaving the taxpayer to his District Court remedy if the decision of the Board was adverse, Secretary of the Treasury Mellon stated: "The taxpayer, in the event that decision [of the Board] is against him, will have to pay the tax according to the assessment and have recourse to the courts . . . ." 67 Cong. Rec. 552.

On September 17, 1924, the first Chairman of the Board, Charles D. Hamel, read a paper before the Seventeenth Annual Conference

There is strong circumstantial evidence that this view of the jurisdiction of the courts was shared by the bar at least until 1940, when the Second Circuit Court of Appeals rejected the Government's position in *Coates* v. *United States*, 111 F. 2d 609. Out of the many thousands of refund cases litigated in the pre-1940 period—the Govern-

---

of the National Tax Association on Taxation which contained the following remark: "Prior to the enactment of the Act of 1924 . . . [i]f the decision on the appeal [to the Commissioner] was in favor of the government, the taxpayer, only after payment of the tax, had the right to protest the correctness of the decision in the courts . . . ." Proceedings 277–278.

One of the clearest statements of the rule by a commentator is to be found in Bickford, Court Procedure in Federal Tax Cases (Rev. ed. 1929) 3, 7–8, 9, 119.

"There are, however, certain other conditions which must be complied with before a suit is maintainable under this section. Briefly stated, these are as follows:

"1. The tax must have been paid.

"2. After payment, the taxpayer must have filed with the Commissioner . . . a sufficient claim for the refund of the taxes sued for.

.        .        .        .        .

"The first requirement is obvious. We have, in the preceding portions of this volume, found that a proceeding commenced in the Board of Tax Appeals is the only exception to the rule that no review by the courts is permissible at common law or under the statutes, until the tax has been paid and the Government assured of its revenue." *Id.*, at 119.

See also Hamel, The United States Board of Tax Appeals (1926), 10; Klein, Federal Income Taxation (1929), 1372, 1642, 1643; Mellon, Taxation: The People's Business (1924), 62–63; Ballantine, Federal Income Tax Procedure, Lectures on Taxation, Columbia University Symposium (1932), 179, 192–193; Caspers, Assessment of Additional Income Taxes for Prior Years, 1 Nat. Income Tax Mag. (Oct. 1923), 12; Graupner, The Operation of the Board of Tax Appeals, 3 Nat. Income Tax Mag. (1925), 295. But see Smith, National Taxes, Their Collection, and Rights and Remedies of the Taxpayer, 8 Geo. L. J. 1, 3 (Apr. 1920).

See also Beaman, When Not to Go to the Tax Court: Advantages and Procedures in Going to the District Court, 7 J. Tax. (1957), 356

ment reports that there have been approximately 40,000 such suits in the past 40 years—exhaustive research has uncovered only nine suits in which the issue was present, in six of which the Government contested jurisdiction on part-payment grounds.[37] The Government's failure to

("[T]he *Bushmiaer* case [permitting suit for part of the tax] . . . runs counter to a long tradition of administrative practice and interpretation . . . ."); Rudick and Wender, Federal Income Taxation, 32 N. Y. U. L. Rev. (1957), 751, 777–778 ("It is generally said that a taxpayer has two remedies if he disagrees with a determination of the Commissioner. He may pay the deficiency, file a claim for refund, and sue for the tax in the district court . . . . Alternatively, the taxpayer may petition the Tax Court for review of a deficiency prior to payment. The recent *Bushmiaer* case is a third alternative. . . . [T]he *Bushmiaer* case conflicts with more than thirty years of experience in the administration and collection of taxes."). (Footnote omitted.)

[37] Petitioner cites a number of cases in support of his argument that neither the bar nor the Government has ever assumed that full payment of the tax is a jurisdictional prerequisite to suit for recovery. The following factors rob these cases of the significance attributed to them by the petitioner:

(a) A number of them, although cited by petitioner in his petition for rehearing, were later conceded by him, after his examination of government files, not to be in point.

(b) A number of the cited cases involved excise taxes. The Government suggests—and we agree—that excise tax deficiencies may be divisible into a tax on each transaction or event, and therefore present an entirely different problem with respect to the full-payment rule.

(c) The cases arising after 1940 are insignificant. Once the Second Circuit Court of Appeals had ruled against the Government in *Coates*, taxpayers would naturally be much more inclined to sue before full payment, and the Government might well decide not to raise the objection in a particular case for reasons relating to litigation strategy.

(d) In some of the cases the only amount remaining unpaid at the time of suit was interest. As we have indicated, the statute lends itself to a construction which would permit suit for the tax after full payment thereof without payment of any part of the interest.

(e) In some of the cases the Government was not legally entitled to collect the unpaid tax at the time of suit, either because the tax

172

system at the time permitted installment payment (see note 34, *supra*), because the unpaid portion had not yet been assessed, or for some other reason. Although the statute may not support any distinction based on facts of this nature, it is quite understandable that a taxpayer might have predicated a suit upon the theory that the distinction was meaningful and that the Government might not have contested it, whether because it agreed or for tactical reasons.

In the light of these considerations, we regard the following pre-1941 cases as immaterial: *Baldwin* v. *Higgins*, 100 F. 2d 405 (C. A. 2d Cir. 1938) (petitioner concedes); *Sampson* v. *Welch*, 23 F. Supp. 271 (D. C. S. D. Cal. 1938) (same); *Charleston Lumber Co.* v. *United States*, 20 F. Supp. 83 (D. C. S. D. W. Va. 1937) (same); *Sterling* v. *Ham*, 3 F. Supp. 386 (D. C. Me. 1933) (same); *Farmers' Loan & Trust Co.* v. *Bowers*, 15 F. 2d 706 (D. C. S. D. N. Y. 1926), modified, 22 F. 2d 464 (1927), rev'd, 29 F. 2d 14 (C. A. 2d Cir. 1928) (same); *Heinemann Chemical Co.* v. *Heiner*, 36–4 CCH Fed. Tax Serv. ¶ 9302 (D. C. W. D. Pa. 1936), rev'd, 92 F. 2d 344 (C. A. 3d Cir. 1937) (only interest unpaid); *Welch* v. *Hassett*, 15 F. Supp. 692 (D. C. Mass. 1936), rev'd, 90 F. 2d 833 (C. A. 1st Cir. 1937), aff'd, 303 U. S. 303 (1938) (full assessment paid); *Leavitt* v. *Hendricksen*, 37–4 CCH Fed. Tax Serv. ¶ 9312 (D. C. W. D. Wash. 1937) (no unpaid assessment); *Bowers* v. *Kerbaugh-Empire Co.*, 271 U. S. 170 (1926) (all due installments paid); *Cook* v. *Tait*, 265 U. S. 47 (1924) (same).

Four pre-1941 cases remain. Of these, only two are clearly cases in which the jurisdictional issue was present and not raised by the Government. *Tsivoglou* v. *United States*, 31 F. 2d 706 (C. A. 1st Cir. 1929); *Thomas* v. *United States*, 85 Ct. Cl. 313, 18 F. Supp. 942 (1937). *McFadden* v. *United States*, 20 F. Supp. 625 (D. C. E. D. Pa. 1937); is in the "doubtful" category. There the Commissioner had granted the taxpayer an extension of time for payment of 80% of his assessment and the suit was for the remaining 20%, which had been paid. The relevant facts of the last case, *Peerless Paper Box Mfg. Co.* v. *Routzahn*, 22 F. 2d 459 (D. C. N. D. Ohio 1927), are so unclear that the case means nothing. The Government had applied an admitted 1918 overpayment to a 1917 deficiency, but the deficiency was greater than the overpayment. The taxpayer sued to recover this overpayment, and whether there had been full payment at the time of suit depends upon whether the suit is regarded as one for refund of 1917 or 1918 taxes.

Nor can we agree entirely with petitioner's evaluation of a second group of pre-1941 cases—those in which the issue allegedly was present and the Government did raise it but lost. Five of these cases involved primarily the troublesome concurrent jurisdiction problem that arose before passage of § 7422 (e) of the 1954 Code when a taxpayer both appealed to the Tax Court and brought suit in a Federal District Court. *Brampton Woolen Co.* v. *Field,* 55 F. 2d 325 (D. C. N. H. 1931), rev'd, 56 F. 2d 23 (C. A. 1st Cir. 1932), cert. denied, 287 U. S. 608; *Camp* v. *United States,* 44 F. 2d 126 (C. A. 4th Cir. 1930); *Emery* v. *United States,* 27 F. 2d 992 (D. C. W. D. Pa. 1928); *Old Colony R. Co.* v. *United States,* 27 F. 2d 994 (D. C. Mass. 1928); *Ohio Steel Foundry Co.* v. *United States,* 69 Ct. Cl. 158, 38 F. 2d 144 (1930). In all of these cases except *Camp,* it appears that the Government did raise the part-payment question. It is true that the contention did not prevail, but this is not very meaningful. In the first place, this question was quite subordinate to the major issue, concurrent jurisdiction. In the second place, the Government won in *Brampton* on another jurisdictional ground. And finally, in contrast to *Flora,* in both *Camp* and *Ohio Steel Foundry* the full assessment *had* been paid at the time suit was brought; it was only later that an additional deficiency was asserted by the Commissioner.

To these cases should be added *Riverside Hospital* v. *Larson,* 38–4 CCH Fed. Tax Serv. ¶ 9542 (D. C. S. D. Fla. 1938), where the Government raised the full-payment question and won, and *Suhr* v. *United States,* 14 F. 2d 227 (D. C. W. D. Pa. 1926), aff'd, 18 F. 2d 81 (C. A. 3d Cir. 1927), another concurrent jurisdiction case where the Government raised the issue and won, although the grounds for the decision are not entirely clear.

This, then, is how we see the pre-1941 situation: Of 14 cases originally cited as being cases in which the jurisdictional issue was present but not raised by the Government, five have been conceded by petitioner not to be in point; six, and possibly seven, are distinguishable for various reasons; and only two, or possibly three, remain. Of five cases cited as being cases in which the jurisdictional issue was raised by the Government, only one, *Coates* v. *United States,* 111 F. 2d 609 (C. A. 2d Cir. 1940), or at most three, really involved the *Flora* question. When to these are added *Riverside,* where the Government won, *Suhr,* where it may have won, and *Brampton Woolen Co.,* where it won in the Court of Appeals on another jurisdictional ground, the box score is as follows: two or three cases in which the

Government failed to raise the issue; one, or possibly three, cases in which the Government argued the question and lost; one case in which it argued the question and won; one case in which it argued the question and may have won; and one case in which it raised the issue and prevailed on another jurisdictional defense—a total of nine cases at most in which the issue was presented, out of which the Government contested jurisdiction in six. Of course, this calculation may not be precise; but, in view of the many thousands of tax refund suits which have been brought during the decades in question, it is an accurate enough approximation to reflect a general understanding of the jurisdictional significance of "pay first, litigate later."

It would be bootless to consider each of the post-1940 cases cited by petitioner or to list the multitude of cases cited by the Government in which the jurisdictional issue has been raised. As we have stated, we believe these cases have no significance whatsoever. However, perhaps it is worth noting that all but a handful of the cases which petitioner, in the  petition for rehearing, asserted to be ones in which the Government failed to raise the jurisdictional issue would be immaterial even if they were pre-*Coates*. Thus, for example, petitioner has conceded error with respect to three cases. *Dickstein* v. *McDonald*, 149 F. Supp. 580 (D. C. M. D. Pa. 1957), aff'd, 255 F. 2d 640 (C. A. 3d Cir. 1958); *O'Connor* v. *United States*, 76 F. Supp. 962 (D. C. S. D. N. Y. 1948); *Terrell* v. *United States*, 64 F. Supp. 418 (D. C. E. D. La. 1946). A number of the cases involved excise taxes. *E. g.*, *Griffiths Dairy* v. *Squire*, 138 F. 2d 758 (C. A. 9th Cir. 1943); *Auricchio* v. *United States*, 49 F. Supp. 184 (D. C. E. D. N. Y. 1943). In some of the cases only interest remained unpaid. *Raymond* v. *United States*, 58–1 U. S. T. C. ¶ 9397 (D. C. E. D. Mich. 1958); *Hogg* v. *Allen*, 105 F. Supp. 12 (D. C. M. D. Ga. 1952). And some of the cases arose in the Third Circuit after a decision adverse to the Government in *Sirian Lamp Co.* v. *Manning*, 123 F. 2d 776 (C. A. 3d Cir. 1941). *Gallagher* v. *Smith*, 223 F. 2d 218 (1955); *Peters* v. *Smith*, 123 F. Supp. 711 (D. C. E. D. Pa. 1954), rev'd, 221 F. 2d 721 (1955). It might be noted also that *Jones* v. *Fox*, 162 F. Supp. 449 (D. C. Md. 1957), cited as a case in which the Government argued the jurisdictional question and lost, was an excise tax case in which the court distinguished our prior decision in *Flora* because of the divisibility of the excise tax. Another such decision during the pre-1941 period was *Friebele* v. *United States*, 20 F. Supp. 492 (D. C. N. J. 1937).

raise the issue in the other three is obviously entirely without significance. Considerations of litigation strategy may have been thought to militate against resting upon such a defense in those cases. Moreover, where only nine lawsuits involving a particular issue arise over a period of many decades, the policy of the Executive Department on that issue can hardly be expected to become familiar to every government attorney. But most important, the number of cases before 1940 in which the issue was present is simply so inconsequential that it reinforces the conclusion of the prior opinion with respect to the uniformity of the pre-1940 belief that full payment had to precede suit.

A word should also be said about the argument that requiring taxpayers to pay the full assessments before bringing suits will subject some of them to great hardship. This contention seems to ignore entirely the right of the taxpayer to appeal the deficiency to the Tax Court without paying a cent.[38] If he permits his time for filing such an appeal to expire, he can hardly complain that he has been unjustly treated, for he is in precisely the same position as any other person who is barred by a statute of limitations. On the other hand, the Government has a substantial interest in protecting the public purse, an interest which would be substantially impaired if a taxpayer could sue in a District Court without paying his tax in full. It is instructive to note that, as of June 30, 1959, tax cases pending in the Tax Court involved $920,046,748, and refund suits in other courts involved $446,673,640.[39]

---

[38] Petitioner points out that the Tax Court has no jurisdiction over excise tax cases. See 9 Mertens, Law of Federal Income Taxation (Zimet Rev. 1958), § 50.08. But this fact provides no policy support for his position, since, as we have noted, excise tax assessments may be divisible into a tax on each transaction or event, so that the full-payment rule would probably require no more than payment of a small amount. See note 37, *supra*.

[39] Of this $446,673,640, District Court suits involved $222,177,920; Court of Claims suits, $220,247,436; and state court suits, $4,248,284.

It is quite true that the filing of an appeal to the Tax Court normally precludes the Government from requiring payment of the tax,[40] but a decision in petitioner's favor could be expected to throw a great portion of the Tax Court litigation into the District Courts.[41]  Of course, the Government can collect the tax from a District Court suitor by exercising its power of distraint—if he does not split his cause of action—but we cannot believe that compelling resort to this extraordinary procedure is either wise or in accord with congressional intent.  Our system of taxation is based upon voluntary assessment and payment, not upon distraint.[42]  A full-payment requirement will promote the smooth functioning of this system; a part-payment rule would work at cross-purposes with it.[43]

In sum, if we were to accept petitioner's argument, we would sacrifice the harmony of our carefully structured twentieth century system of tax litigation, and all that

---

[40] See note 22, *supra.*

[41] The practical effects which might result from acceptance of petitioner's argument are sketched in Lowitz, Federal Tax Refund Suits and Partial Payments, 9 The Decalogue J. 9, 10:
"Permitting refund suits after partial payment of the tax assessment would benefit many taxpayers.  Such a law would be open to wide abuse and would probably seriously impair the government's ability to collect taxes.  Many taxpayers, without legitimate grounds for contesting an assessment, would make a token payment and sue for refund, hoping at least to reduce the amount they would ultimately have to pay.  In jurisdictions where the District Court is considered to be a 'taxpayer's court' most taxpayers would use that forum instead of the Tax Court.  Conceivably such legislation could cause the chaotic tax collection situations which exist in some European countries, since there would be strong impetus to a policy of paying a little and trying to settle the balance."

[42] See *Helvering* v. *Mitchell,* 303 U. S. 391, 399; Treas. Regs. on Procedural Rules (1954 Code) § 601.103 (a).

[43] See Riordan, Must You Pay Full Tax Assessment Before Suing in the District Court? 8 J. Tax. 179, 181:
"1. If the Government is forced to use these remedies [distraint]

would be achieved would be a supposed harmony of § 1346 (a)(1) with what might have been the nineteenth century law had the issue ever been raised. Reargument has but fortified our view that § 1346 (a)(1), correctly construed, requires full payment of the assessment before an income tax refund suit can be maintained in a Federal District Court.

*Affirmed.*

MR. JUSTICE FRANKFURTER.

I should like to append a word to my Brother WHITTAKER's opinion, with which I entirely agree.

While *Dobson* v. *Commissioner,* 320 U. S. 489, is no longer law, the opinion of the much lamented Mr. Justice Jackson, based as it was on his great experience in tax litigation, has not lost its force insofar as it laid bare the complexities and perplexities for judicial construction of tax legislation. For one not a specialist in this field to examine every tax question that comes before the Court independently would involve in most cases an inquiry into the course of tax legislation and litigation far beyond the facts of the immediate case. Such an inquiry entails weeks of study and reflection. Therefore, in construing a tax law it has been my rule to follow almost blindly accepted understanding of the meaning of tax legislation, when that is manifested by long-continued, uniform

---

on a large scale, it will affect adversely taxpayers' willingness to perform under our voluntary assessment system.

"2. It will put the burden on the Government to seek out for seizure the property of every taxpayer who chooses to sue for the refund of a partial payment. Often, the Government will not be able to do this without extraordinary and costly effort and in some cases it may not be able to do it at all.

"3. The use of the drastic-collection remedies would often cause inconvenience and perhaps hardship to the creditors, debtors, employers, employees, banks and other persons doing business with the taxpayer."

practice, unless a statute leaves no admissible opening for administrative construction.

Therefore, when advised in connection with the disposition of this case after its first argument that "there does not appear to be a single case before 1940 in which a taxpayer attempted a suit for refund of income taxes without paying the full amount the Government alleged to be due," (357 U. S. 63, at 69), I deemed such a long-continued, unbroken practical construction of the statute controlling as to the meaning of the Revenue Act of 1921, now 28 U. S. C. § 1346 (a)(1). Once the basis which for me governed the disposition of the case was no longer available, I was thrown back to an independent inquiry of the course of tax legislation and litigation for more than a hundred years, for all of that was relevant to a true understanding of the problem presented by this case. This involved many weeks of study during what is called the summer vacation. Such a study led to the conclusion set forth in detail in the opinion of my Brother WHITTAKER.

MR. JUSTICE WHITTAKER, with whom MR. JUSTICE FRANKFURTER, MR. JUSTICE HARLAN, and MR. JUSTICE STEWART join, dissenting.

A deep and abiding conviction that the Court today departs from the plain direction of Congress expressed in 28 U. S. C. § 1346 (a), defeats its beneficent purpose, and repudiates many soundly reasoned opinions of the federal courts on the question presented, compels me to express and explain my disagreement in detail.

In his income tax return for the year 1950, petitioner deducted in full, as ordinary in character, the losses he had suffered in commodity transactions in that year, but the Commissioner viewed those losses as capital in

character and proposed, by his 90-day letter, the assessment of a deficiency in the amount of $27,251.13, plus interest. Petitioner did not petition the Tax Court for a redetermination of the proposed deficiency and the Commissioner assessed it on March 27, 1953. In April and June 1953, petitioner paid to the Commissioner a total of $5,058.54 upon the assessment and timely thereafter filed a claim for refund of that sum. The claim was rejected on July 13, 1955, and, on August 3, 1956, petitioner brought this action against the United States in the District Court for Wyoming to recover the amount paid, alleging, *inter alia*, that said sum "has been illegally and unlawfully collected" from him, and he prayed judgment therefor with interest from the date of payment.

At the trial, the Government prevailed on the merits, 142 F. Supp. 602, but the Court of Appeals, without reaching the merits, remanded with directions to dismiss, holding that because the petitioner had not paid the entire amount of the assessment the District Court had no jurisdiction of the action. 246 F. 2d 929. We granted certiorari and, after hearing, affirmed the judgment of the Court of Appeals. 357 U. S. 63. On June 22, 1959, we granted a petition for rehearing and restored the case to the docket. 360 U. S. 922. It has since been rebriefed, reargued and again submitted.

The case is now presented in a very different posture than before, as certain vital contentions that were previously made are now conceded to have been erroneous.

The question presented is whether a Federal District Court has jurisdiction of an action by a taxpayer against the United States to recover payments made to the Commissioner upon, but which discharged less than the entire amount of, an illegal assessment.

The answer to that question depends upon whether the United States has waived its sovereign immunity to, and

has consented to, such a suit in a District Court. The applicable jurisdictional statute is 28 U. S. C. § 1346 (a). It provides:

"The district courts shall have original jurisdiction, concurrent with the Court of Claims, of:

"(1) Any civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority *or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws."* (Emphasis added.)

In its former opinion the Court recognized that the words of the statute might "be termed a clear authorization to sue for the refund of 'any sum,' " 357 U. S., at 65, but it concluded that Congress had left room in the statute for an implication that the waiver of immunity and grant of jurisdiction applied only to refund suits in which the entire amounts of assessments had been paid. Advocating the existence of that implication, the Government contended and urged that, from the time of the decision in *Cheatham* v. *United States,* 92 U. S. 85, in 1875 until the decision in *Coates* v. *United States,* 111 F. 2d 609 (C. A. 2d Cir.), in 1940, there was an unquestioned understanding and uniform practice that full payment of an assessment was a condition upon the right to sue for refund; and, finding what it then accepted as adequate support for that contention, the Court was persuaded that, since no subsequent statute had purported to change it, such unquestioned understanding so long and uniformly applied was still effective.

Support for that asserted unquestioned understanding and uniform practice was principally derived from two sources. First, statements in *Cheatham* v. *United States, supra,* were thought to have enunciated a full-payment

doctrine [1] which seemed never to have been directly questioned. Second, the contention was accepted that "there does not appear to be a single case before 1940 in which a taxpayer attempted a suit for refund of income taxes without paying the full amount the Government alleged to be due." 357 U. S., at 69.

The Government now concedes that the second contention was erroneous. There were, for example, two cases in this Court (*Cook* v. *Tait*, 265 U. S. 47 (1924); *Bowers* v. *Kerbaugh-Empire Co.*, 271 U. S. 170 (1926)) in which taxpayers had sued for refunds after having paid only

---

[1] The language of *Cheatham* relied upon by this Court in its first opinion was the following:

"So also, in the internal-revenue department, the statute which we have copied allows appeals from the assessor to the commissioner of internal revenue; and, if dissatisfied with his decision, on paying the tax the party can sue the collector; and, if the money was wrongfully exacted, the courts will give him relief by a judgment, which the United States pledges herself to pay.

.    .    .    .    .

". . . While a free course of remonstrance and appeal is allowed within the departments before the money is finally exacted, the general government has wisely made the payment of the tax claimed, whether of customs or of internal revenue, a condition precedent to a resort to the courts by the party against whom the tax is assessed. . . . If the compliance with this condition [that suit must be brought within six months of the Commissioner's decision] requires the party aggrieved to pay the money, he must do it. He cannot, after the decision is rendered against him, protract the time within which he can contest that decision in the courts by his own delay in paying the money. It is essential to the honor and orderly conduct of the government that its taxes should be promptly paid, and drawbacks speedily adjusted; and the rule prescribed in this class of cases is neither arbitrary nor unreasonable. . . .

"The objecting party can take his appeal. He can, if the decision is delayed beyond twelve months, rest his case on that decision; or he can pay the amount claimed, and commence his suit at any time within that period. So, after the decision, he can pay at once, and commence suit within the six months . . . ." 92 U. S., at 88–89.

portions (in one case $298.34 of an assessment of $1,193.38, in the other $5,198.77 of an assessment of $10,320.14) of the amounts assessed against them. It was not contended by the Government in either of those cases that there was any want of jurisdiction, and this Court considered and decided both upon the merits.[2] Petitioner has now cited many other tax refund cases, decided in the lower courts prior to 1940, in which taxpayers had paid, and sued to recover, less than the whole of assessments alleged to have been illegal, and in which cases the Government did not question jurisdiction.[3] The Government concedes that in

[2] The Government now seeks to distinguish these two cases because they arose under the Revenue Act of 1921, Act of Nov. 23, 1921, c. 136, 42 Stat. 227, and because § 250 (a) of which permitted the taxpayer, at his option, to pay the tax in four trimonthly installments, rather than all at once. The taxpayers in both *Cook* v. *Tait* and *Bowers* v. *Kerbaugh-Empire Co.* did choose to pay in installments, and the Government points to the fact that, at the time the suits were brought, all installments due had been paid, although the full assessment had not. The Government therefore would seem to take the position that the whole tax need *not* be paid, so long as the taxpayer, when he initiates the suit, has paid "all that the taxpayer was at that time legally obligated to pay, and all (in the absence of a so-called jeopardy assessment) that the Commissioner was at that time legally empowered to collect." (It should be pointed out that in *Cook* v. *Tait* and *Bowers* v. *Kerbaugh-Empire Co.* installments fell due immediately after suit was begun, and before hearing or adjudication; these installments were not paid as they came due.) It seems almost unnecessary to say that the words of the jurisdictional statute simply will not support this 'fine distinction urged by the Government; nor is there the least support for it (there is, if anything, contradiction) in the material the Government cites to establish an understanding of the full-payment requirement.

[3] The lower courts' decisions cited by petitioner, that were rendered prior to 1940, in which taxpayers had paid, and sued to recover, less than the whole of assessments alleged to have been illegal, and in which the Government did not question jurisdiction, are: *Tsivoglou* v. *United States*, 31 F. 2d 706 (C. A. 1st Cir. 1929) ; *Heinemann Chemi-*

at least two of these (*Thomas* v. *United States,* 85 Ct. Cl. 313, 18 F. Supp. 942 (1937); *Tsivoglou* v. *United States,* 31 F. 2d 706 (C. A. 1st Cir. 1929), affirming 27 F. 2d 564 (D. C. Mass. 1928)) taxpayers had paid, and sued to

*cal Co.* v. *Heiner,* 92 F. 2d 344 (C. A. 3d Cir. 1937); *Thomas* v. *United States,* 85 Ct. Cl. 313, 18 F. Supp. 942 (1937); *Peerless Paper Box Mfg. Co.* v. *Routzahn,* 22 F. 2d 459 (D. C. N. D. Ohio 1927); *Welch* v. *Hassett,* 15 F. Supp. 692 (D. C. Mass. 1936); *McFadden* v. *United States,* 20 F. Supp. 625 (D. C. E. D. Pa. 1937); *Leavitt* v. *Hendricksen,* 37–2 U. S. T. C., ¶ 9312 (D. C. W. D. Wash. 1937).

In justice to counsel for both parties it seems appropriate to observe—what every lawyer knows—that cases, such as these, in which there "lurked in the record" questions that were not raised or decided are not discoverable by any ordinary means of reference. Without doubt, this fact accounts for the failure of counsel to take account of or to cite, and of this Court to find, those cases on the first hearing.

Petitioner has cited a number of other cases, decided by the lower courts prior to and during 1940, that sought recovery of partial payments upon assessments, and in each of which the Government did challenge, but unsuccessfully, the jurisdiction of the courts, namely, *Coates* v. *United States,* 111 F. 2d 609 (C. A. 2d Cir. 1940); *Camp* v. *United States,* 44 F. 2d 126 (C. A. 4th Cir. 1930); *Ohio Steel Foundry Co.* v. *United States,* 69 Ct. Cl. 158, 38 F. 2d 144 (1930); *Emery* v. *United States,* 27 F. 2d 992 (D. C. W. D. Pa. 1928); *Old Colony R. Co.* v. *United States,* 27 F. 2d 994 (D. C. Mass. 1928).

Petitioner has also cited 22 similar cases, decided by the lower courts since 1940. In 17 of them (*Kavanagh* v. *First National Bank,* 139 F. 2d 309 (C. A. 6th Cir. 1943); *Griffiths Dairy, Inc.,* v. *Squire,* 138 F. 2d 758 (C. A. 9th Cir. 1943); *United States* v. *Pfister,* 205 F. 2d 538 (C. A. 8th Cir. 1953); *Gallagher* v. *Smith,* 223 F. 2d 218 (C. A. 3d Cir. 1955); *Perry* v. *Allen,* 239 F. 2d 107 (C. A. 5th Cir. 1956); *Auricchio* v. *United States,* 49 F. Supp. 184 (D. C. E. D. N. Y. 1943); *Professional Golf Co.* v. *Nashville Trust Co.,* 60 F. Supp. 398 (D. C. M. D. Tenn. 1945); *Jack Little Foundation* v. *Jones,* 102 F. Supp. 326 (D. C. W. D. Okla. 1951); *Hogg* v. *Allen,* 105 F. Supp. 12 (D. C. M. D. Ga. 1952); *Snyder* v. *Westover,* 107

recover, less than the whole of deficiency assessments and that the Government did not question jurisdiction in either of them. Prior to the decision in the present case there were two decisions in the Courts of Appeals that fully treated with the precise question here presented. Both held that District Courts have jurisdiction over actions to recover partial payments upon assessments alleged to have been illegal. *Coates* v. *United States,* 111 F. 2d 609 (C. A. 2d Cir. 1940); *Bushmiaer* v. *United States,* 230 F. 2d 146 (C. A. 8th Cir. 1956).[4] Certainly, the cited cases and the Government's concession preclude

F. Supp. 363 (D. C. S. D. Cal. 1952); *Wheeler* v. *Holland,* 120 F. Supp. 383 (D. C. N. D. Ga. 1954); *Peters* v. *Smith,* 123 F. Supp. 711 (D. C. E. D. Pa. 1954); *Zukin* v. *Riddell,* 55–2 U. S. T. C., ¶ 9688 (D. C. S. D. Cal. 1955); *Lewis* v. *Scofield,* 57–1 U. S. T. C., ¶ 9251 (D. C. W. D. Tex. 1956); *McFarland* v. *United States,* 57–2 U. S. T. C., ¶ 9733 (D. C. M. D. Tenn. 1957); *Raymond* v. *United States,* 58–1 U. S. T. C., ¶ 9397 (D. C. E. D. Mich. 1958); *Freeman* v. *United States,* 58–1 U. S. T. C., ¶ 9309 (D. C. S. D. Cal. 1958)) the Government did not question the jurisdiction of the courts, and in the other five cases (*Bushmiaer* v. *United States,* 230 F. 2d 146 (C. A. 8th Cir. 1956); *Sirian Lamp Co.* v. *Manning,* 123 F. 2d 776 (C. A. 3d Cir. 1941); *Jones* v. *Fox,* 57–2 U. S. T. C., ¶ 9876 (D. C. Md. 1957); *Hanchett* v. *Shaughnessy,* 126 F. Supp. 769 (D. C. N. D. N. Y. 1954); *Rogers* v. *United States,* 155 F. Supp. 409 (D. C. E. D. N. Y. 1957)) the Government did challenge the jurisdiction of the courts, but prevailed upon the point only in the last-mentioned case.

[4] *Sirian Lamp Co.* v. *Manning,* 123 F. 2d 776 (C. A. 3d Cir. 1941) was a suit against the Collector and, therefore, did not come under the jurisdictional provision here in issue, which is applicable only to suits against the United States. But it held expressly that a suit for refund may be maintained to recover a partial payment of an assessment. No one has suggested that the jurisdictional requirement of the amount of the assessed tax that must be paid as a prerequisite to a suit for refund is different when the suit is against the Collector, with regard to which suits there is no specific jurisdictional provision, rather than against the United States.

a conclusion that there ever was an unquestioned understanding and uniform practice that full payment of an assessed deficiency was a condition upon the jurisdiction of a District Court to entertain a suit for refund.

In the light of the foregoing, it is clear that nothing in *Cheatham* v. *United States, supra,* fairly may be said to hold that full payment of an illegally assessed deficiency is a condition upon the jurisdiction of a District Court to entertain a suit for refund. No such issue was involved in that case. There the assessment had been fully paid, and the only issue was whether a proper claim for refund was a condition precedent to the maintenance of a suit to recover the amount alleged to have been illegally collected. Not only were the statements there made respecting "payment of the tax" pure dictum, but even the language there used did not embrace, and certainly was not directed to, the question whether full payment of an assessment is a condition upon the jurisdiction of a District Court to entertain a suit for refund.

I pass, then, to an examination of the history of the present jurisdictional provision, § 1346 (a), and the scheme of the present tax law to determine whether there is any real support for the Government's contention that a proper reading of the language of § 1346 (a) requires an implied qualification to its obvious self-explanatory meaning, so that full payment of an assessment, alleged to have been illegal, is made a condition upon the jurisdiction of a District Court to entertain a suit for refund.

Judicial proceedings for refund of United States taxes in federal courts originated, without express statutory authority, by suits against Collectors (now District Directors), before the United States had made itself amenable to suit. *Elliott* v. *Swartwout,* 10 Pet. 137 (1836), recognized the existence of a right of action against a Collector of Customs for refund of duties

illegally assessed and paid under protest.[5]   The doctrine of the action, based upon the common-law count of assumpsit for money had and received, was thus formulated: "[W]here money is illegally demanded and received by an agent, he cannot exonerate himself from personal responsibility by paying it over to his principal; if he has had notice not to pay it over."   10 Pet., at 158.   As a result of that case, Collectors of Customs who collected monies, paid under protest, resorted to the practice of withholding such amounts from the Government as indemnity against loss should a refund suit against them be successful.   See Plumb, Tax Refund Suits Against Collectors of Internal Revenue, 60 Harv. L. Rev. 685, 688–689. That practice led to abuses and facilitated peculation under the guise of self-protection.   Because of the wholesale frauds of Swartwout, the New York Collector (see Swartwout, 18 Dictionary of American Biography (1936), 238–239), Congress, in 1839, expressly prohibited such withholdings by Customs Collectors pending the possibility, or the result, of litigation against them.   Act of Mar. 3, 1839, c. 82, § 2, 5 Stat. 348.   Six years later, in 1845, this Court held that this Act, by reducing the Collector to "the mere bearer of those sums [duties] to the Treasury," terminated the right of action against the Collector for refund, for, being deprived of the right to withhold payment to his principal, he was no longer under an implied promise to refund illegally collected duties to the taxpayer.   *Cary* v. *Curtis,* 3 How. 236, 241 (1845).

This created the intolerable condition of denying to taxpayers any remedy whatever in the District Courts to recover amounts illegally assessed and collected, and—doubtless also influenced by the vigorous dissents of Mr.

---

[5] See also *Bend* v. *Hoyt,* 13 Pet. 263, 267 (1839). *Elliott* v. *Swartwout* seems to have been the first case in this country expressly to recognize the right.   ·

Justice Story and Mr. Justice McLean in that case—
induced Congress to pass the Act of Feb. 26, 1845, c. 22,
5 Stat. 727,[6] which was the first statute expressly giving
taxpayers the right to sue for refund of taxes illegally
collected.   That Act, in substance, provided that nothing
contained in the Act of Mar. 3, 1839 (c. 82, § 2, 5 Stat.
348), should be construed to take away or impair the right
of any person who had paid duties under protest to any
Collector of Customs, which were not lawfully "payable
in part or in whole," to maintain an action at law against
the Collector to recover such amounts.   It is evident that
Congress, by that statute, was merely concerned to reverse
the consequences of *Cary* v. *Curtis, supra,* and to restore
the right of action against Collectors which had originally
been sustained in *Elliott* v. *Swartwout, supra.*   Neither the
terms of that statute nor such knowledge as is available
of its history[7] reveals any limiting purpose except that

---

[6] The Act of Feb. 26, 1845, c. 22, 5 Stat. 727, in pertinent part,
provides:

"[N]othing contained in [the Act of Mar. 3, 1839, c. 82, § 2] . . .
shall take away, or be construed to take away or impair, the right
of any person or persons who have paid or shall hereafter pay money,
as and for duties, under protest, to any collector of the customs . . .
which duties are not authorized or payable in part or in whole by
law, to maintain any action at law against such collector . . . to
ascertain and try the legality and validity of such demand and
payment of duties . . . ; nor shall any action be maintained against
any collector, to recover the amount of duties so paid under protest,
unless the said protest was made in writing, and signed by the
claimant, at or before the payment of said duties, setting forth dis-
tinctly and specifically the grounds of objection to the payment
thereof."

[7] The only statements with regard to the purpose of the bill in
Congress which have been found are the remarks of Senators Hunt-
ington and Woodbury, Cong. Globe, 28th Cong., 2d Sess. 195 (1845).
See also 5 Stat. 349, n. (a): "[Congress being in session when the
decision of the court in the case of *Carey* v. *Curtis,* 3 Howard, 236,
was made, the following act [the Act of Feb. 26, 1845] was passed.]"

the protest be made in writing before or at the time of the payment.

While that statute, the Act of Feb. 26, 1845, referred only to refunds of customs duties, this Court held in *City of Philadelphia* v. *The Collector*, 5 Wall. 720, 730–733 (1866), that taxpayers had the same right of action against Collectors to recover illegally collected internal revenue taxes.[8]

The United States was first made directly suable in District Courts for tax refunds by the Act of Mar. 3, 1887, c. 359, 24 Stat. 505, commonly known as the Tucker Act, which conferred jurisdiction on the District Courts over "All claims [against the United States, not exceeding $1,000] founded upon the Constitution of the United States or any law of Congress, . . . or upon any contract, expressed or implied, with the Government of the United States, or for damages, liquidated or unliquidated, in cases not sounding in tort, in respect of which claims the party would be entitled to redress against the United States either in a court of law, equity, or admiralty if the United States were suable." This jurisdictional grant

---

[8] The Court recognized that internal revenue collectors, like customs collectors, were required to pay daily into the Treasury all sums collected under the internal revenue laws. Act of Mar. 3, 1865, c. 78, § 3, 13 Stat. 483. In refusing to reach the same result as had been reached in *Cary* v. *Curtis*, without an express saving statute such as the Act of Feb. 26, 1845, the Court relied upon the provisions in the internal revenue laws that the Commissioner shall pay all judgments for refunds recovered against Collectors. Act of Mar. 3, 1863, c. 74, § 31, 12 Stat. 729; Act of June 30, 1864, c. 173, § 44, 13 Stat. 239; Act of July 13, 1866, c. 184, § 9, 14 Stat. 101, 111. "Clear implication of the several provisions is, that a judgment against the collector in such a case [a refund suit] is in the nature of a recovery against the United States, and that the amount recovered is regarded as a proper charge against the revenue collected from that source." *City of Philadelphia* v. *The Collector*, 5 Wall., at 733.

was held, in *United States* v. *Emery, Bird, Thayer Realty Co.*, 237 U. S. 28 (1915), to have included jurisdiction over suits for tax refunds, as claims "founded upon" the internal revenue laws. The general language of that Act, the Tucker Act, was most evidently not intended to, and did not, impose any new conditions upon the pre-existing right to sue (the Collector) for the refund of taxes illegally collected, save for a monetary limit of $1,000, which was increased to $10,000 in 1911.[9]

The gist of § 1346 (a),[10] with which we are now concerned, first appeared in the jurisdictional statute in 1921, as part of the Revenue Act of 1921, c. 136, § 1310 (c), 42 Stat. 311. The reason for its appearance is entirely unrelated to the question whether full payment of an assessment is a condition precedent to a suit for refund. Under the Tucker Act, as it stood in 1921, the United States could not be sued in a District Court for a tax refund of more than $10,000. Taxpayers with larger claims could pursue either their old remedy—which continued to be available and is today—against the Collector in the District Courts or their remedy against the United States in the Court of Claims. But, the right of suit against the Collector was impaired in 1921 by the decision in *Smietanka* v. *Indiana Steel Co.*, 257 U. S. 1 (1921). It held that such actions against the Collector were personal in character and not maintainable against his successor in office. Hence, if the Collector had died or ceased to be

---

[9] Act of Mar. 3, 1911, c. 231, § 24, 36 Stat. 1093. The monetary limitation was entirely eliminated in 1954. Act of July 30, 1954, c. 648, § 1, 68 Stat. 589.

[10] The gist of § 1346 (a) provides: "for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws." 28 U. S. C. § 1346 (a).

in office, a taxpayer with a refund claim of more than $10,000 had no remedy in a District Court. The portion of the Revenue Act of 1921 that is now embodied in § 1346 (a) was an amendment of the Tucker Act and was designed to preserve to taxpayers with claims of more than $10,000 a District Court remedy, even where the Collector had died or was out of office, by suit against the United States. The legislative history makes this purpose plain.[11]

The relevant portion of the 1921 Amendment to the Tucker Act—part of the Revenue Act of 1921 (c. 136, § 1310 (c), 42 Stat. 311) [12]—was apparently taken from a provision in Revised Statutes § 3226 (1875) that "No suit shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until appeal shall have been duly made to the Commissioner of the Internal Revenue." [13]   In that context it is clear that the language "any tax," "any penalty" or "any sum" had no reference to what payments were required to precede a suit for refund.   Quite evidently, its function was only to describe, in broadest terms,

---

[11] See 61 Cong. Rec. 7506–7507 (1921) ; H. R. Conf. Rep. No. 486, 67th Cong., 1st Sess. 57 (1921).

[12] See note 10.

[13] This language was in turn preceded by § 19 of the Revenue Act of July 13, 1866, c. 184, 14 Stat. 152, which did not include any reference to "penalties" or "sums": "[N]o suit shall be maintained in any court for the recovery of any tax alleged to have been erroneously or illegally assessed or collected, until appeal shall have been duly made to the commissioner of internal revenue . . . ." It is important to note that this was the "claim for refund" statute in effect at the time of, and that was applicable to, *Cheatham* v. *United States, supra.* Quite unlike § 1346 (a), it made no reference to "any sum."

the claims for refund which were required to be submitted to the Commissioner before suit might be brought thereon. What reasonable basis is there for ascribing to Congress, by reason of its insertion of this language into the Tucker Act, an intent to require full payment of an illegal assessment as a condition upon the jurisdiction of a District Court to entertain a suit for refund? The change was a jurisdictional one in a jurisdictional statute, and the language, it is almost necessary to assume, was chosen because, in another statute, it referred to all of the actions which could be brought for refund of internal revenue taxes.

The Government heavily relies on statements made in Congress pertaining to the establishment in 1924 of the Board of Tax Appeals (since 1942 designated the Tax Court) and its reorganization in 1926. It asserts that these statements demonstrate a congressional understanding that the broad language in § 1346 (a) excludes jurisdiction of District Courts to entertain suits to recover only partial payments of assessments alleged to be illegal. It is true that those statements, some of which are reproduced in the margin,[14] are consistent with the Govern-

---

[14] "The committee [on Ways and Means] recommends the establishment of a Board of Tax Appeals to which a taxpayer may appeal prior to the payment of an additional assessment of income, excess-profits, war-profits, or estate taxes. Although a taxpayer may, after payment of his tax, bring suit for the recovery thereof and thus secure a judicial determination on the questions involved, he can not, in view of section 3224 of the Revised Statutes, which prohibits suits to enjoin the collection of taxes, secure such a determination prior to the payment of the tax. The right of appeal after payment of the tax is an incomplete remedy, and does little to remove the hardship occasioned by an incorrect assessment. The payment of a large additional tax on income received several years previous and which may have, since its receipt, been either wiped out by subsequent losses, invested in nonliquid assets, or spent, sometimes forces taxpayers into bankruptcy, and often causes great financial hardship

ment's interpretation of that section. But, as with the statements in *Cheatham* v. *United States, supra,* they are not directed to the question we have here and are too imprecise for the drawing of such a far-reaching inference, involving, as it does, the interpolation of a drastic quali-

and sacrifice. These results are not remedied by permitting the taxpayer to sue for the recovery of the tax after this payment. He is entitled to an appeal and to a determination of his liability for the tax prior to its payment." H. R. Rep. No. 179, 68th Cong., 1st Sess. 7 (1924).

"Now, it is true that under the present law it is possible to get a judicial review, but it is very slow and expensive. In order to get a judicial review under the law as it exists to-day a man must pay his tax and pay it under protest; then he must file a claim for refund; then the Government has six months within which to accept or reject it; then after that he must begin an action in the courts." Remarks of Representative Young, 65 Cong. Rec. 2621 (1924).

"The practice, as I understand it, has been to require the taxpayer to pay in the amount of the increased assessment, and then to allow him to get it back if he can. In addition to this, distraints frequently have been issued seizing the property of the citizen, so that the man whose taxes may have been raised unjustly may find himself forced to raise a large sum of money at once or have his property seized." Remarks of Senator Reed of Missouri, 65 Cong. Rec. 8109 (1924).

"One of the chief arguments presented in the reports of the committees of both Houses [upon the creation of the Board of Tax Appeals] was to relieve the taxpayer of the hardship of being forced to go out and pay his tax before he could have a judicial consideration of the problems involved in his case. The taxpayer who was faced with, say, $100,000 of additional tax, and who was forced to pay that money, very frequently had his credit destroyed, and sometimes he was forced into bankruptcy in order to meet that payment. It was a real hardship. The man who had already paid the tax had gone through the suffering, had filed his claim for refund, and had his remedy. He has the remedy that he had prior to the creation of the board." Statement of Charles D. Hamel, first Chairman of the Board of Tax Appeals, Hearings before the House Committee on Ways and Means on the Revenue Revision, 1925, Oct. 19 to Nov. 3, 1925, pp. 922, 923.

fication into the otherwise plain, clear and unlimited provisions of the statute.

The Tax Court was created to alleviate hardships occasioned by the fact that the collection of assessments, however illegal, could not be enjoined. And the Government argues that the hardships which motivated Congress to establish the Tax Court would not have existed if a taxpayer could, as the petitioner did here, pay only part of a deficiency assessment and then, by way of a suit for refund, litigate the legality of the assessment in a District Court. But that procedure would not then, nor today, afford any sure relief to taxpayers from the hardships which troubled Congress in 1924, for it is undisputed that the institution of a suit for refund of a partial payment of an assessment does not stay the Commissioner's power of collection [15] by distraint or otherwise, and a taxpayer with the property or means to pay the balance of the assessment cannot avoid its payment, except through the Commissioner's acquiescence and failure to exercise his power of distraint.[16]

The Government argues, with some force, that our tax legislation as a whole contemplates the Tax Court as the forum for adjudication of deficiencies, and the District Courts and Court of Claims as the forums for adjudication of refund suits. This, in general, is true, and it is also true that to hold that full payment of assessments

---

[15] "Except as provided in sections 6212 (a) and (c), and 6213 (a) [giving a right to petition the Tax Court], no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court." Int. Rev. Code, 1954, § 7421. Such a provision has been in the law since the Act of Mar. 2, 1867, c. 169, § 10, 14 Stat. 475.

[16] Indeed there does not seem to be any way of restraining the Commissioner from collecting the remainder of a deficiency even *after* the taxpayer who has paid part has *won* a suit for refund, the Commissioner thus forcing the taxpayer to bring another action for refund.

is not a condition upon the jurisdiction of District Courts to entertain suits for refund is to sanction what may be called a "hybrid" remedy in the District Courts, for the suit of the taxpayer who has paid only part of an assessment and has sued for refund will, under application of the principles of collateral estoppel, determine the legality of the remainder of the deficiency as well as his right to refund of the amount paid. But such dual determinations are possible under the present law [17] and it is difficult to conceive how they may create sufficient disharmony to justify such a strained interpretation of the plain words of § 1346 (a) as the Government's contention would require.[18]

Nor is the argument sound that to hold that full payment of an illegal assessment is not a condition upon the jurisdiction of District Courts to entertain suits for refund would unduly hamper the collection of taxes, by encouraging taxpayers to withhold payment of large portions of assessments while prosecuting litigation for the refund of the part already paid. Not only is it true that the institution of a suit for refund does not stay collection,[19] but, since the creation of the Tax Court, any taxpayer has a method of withholding payment, immune

---

[17] See §§ 7422 (e) and 6512 of the Internal Revenue Code of 1954 giving, respectively, the District Courts and the Tax Court jurisdiction over suits involving both deficiencies and claims for refund.

[18] The Government suggests that if this Court permits the petitioner to maintain his action for refund it will, as a consequence, sanction the practice of a taxpayer making only "token payment," and then, by a suit for refund, adjudicating the legality of the entire assessment. We are not here concerned with such a totally different question. Petitioner's payment of $5,058.54 on an assessment of $27,251.13 certainly was not a "token payment"; nor could the suit to recover the amount paid be said to be one for a declaratory judgment—not permitted "with respect to Federal taxes"—under 28 U. S. C. § 2201.

[19] See note 15.

from distraint,[20] until the legality of the assessment is finally determined. Any delay in collection which might be caused by holding that full payment of an assessment is not a condition upon the jurisdiction of a District Court to entertain a suit for refund would be of the same order as the delay incident to adjudication by the Tax Court, and would not create so incongruous a result as to justify giving an otherwise clear and unlimited statute a strained and unnatural meaning.

Petitioner, on the other hand, suggests that if it be held that full payment of illegal assessments is a condition upon the jurisdiction of District Courts in refund suits, not only will the words of § 1346 (a) be disregarded, but great hardships upon taxpayers will result, and that such an intention should not lightly be implied. Where a taxpayer has paid, upon a normal or a "jeopardy" assessment, either voluntarily or under compulsion of distraint, a part only of an illegal assessment and is unable to pay the balance within the two-year period of limitations,[21] he would be deprived of any means of establishing the invalidity of the assessment and of recovering the amount illegally collected from him, unless it be held, as it seems to me Congress plainly provided in § 1346 (a), that full payment is not a condition upon the jurisdiction of District Courts to entertain suits for refund.[22] Likewise, tax-

---

[20] Except for the provision made for a "jeopardy assessment." Int. Rev. Code, 1954, § 6861.

[21] See Int. Rev. Code, 1954, §§ 6511, 6532, 26 U. S. C. §§ 6511, 6532.

[22] The grossly unfair and, to me, shockingly inequitable result of today's holding may be laid bare by assuming a commonplace set of facts: Two brothers, doing business as partners—one having a 60% and the other a 40% interest in the partnership—failed in their business which was then liquidated in bankruptcy. Thereafter, based upon the partnership's transactions, the Commissioner proposed deficiency assessments in income taxes—one against the major partner of $6,000 and another against the minor one of $4,000. Be-

payers who pay assessments in installments would be
without remedy to recover early installments that were
wrongfully collected should the period of limitations run
before the last installment is paid.

No one has suggested that Congress could not constitu-
tionally confer jurisdiction upon District Courts to enter-
tain suits against the United States to recover sums

ing without funds to employ counsel to prepare, file in Washington,
and prosecute a petition for redetermination in the Tax Court, none
was filed by either of the taxpayers, and the Commissioner made the
assessments as proposed. One year later, their father died intestate,
and thereupon the family homestead vested equally in his two sons
(the taxpayers) under the State's laws of descent. The tax liens
were, of course, instantly impressed upon their respective interests,
and, under warrants of distraint, the Commissioner sold the home-
stead. It brought a total of $8,500 ($4,250 for the interest of each
of the taxpayers). This, of course, satisfied the assessment and
accrued interest against the minor partner, but left unpaid about
$2,000 of the assessment and accrued interest against the major
partner. Both filed claims for refund, which were denied. The
taxpayers then filed separate suits, presenting identical issues, in the
same Federal District Court to recover the taxes and interest thus
collected by the Commissioner. The cases were consolidated for trial.
The Court found that the assessments were illegal and the taxes
wrongfully collected. The proceeds of the sale of the minor tax-
payer's interest being sufficient to discharge the illegal assessment
and accrued interest against him, the court rendered judgment in his
favor for the sum thus wrongfully collected. But, inasmuch as the
proceeds of the sale were not sufficient to discharge the illegal assess-
ment against the major partner, and he was financially unable to pay
the balance of it, the Court held that it lacked jurisdiction to allow
his recovery of the $4,250 thus found to have been wrongfully
collected from him under the internal revenue laws. Is this fair?
Is it not shocking? More to the point, is not that result plainly
proscribed by Congress' words in § 1346 (a) that: *"The district
courts shall have original jurisdiction . . . of . . . Any civil action
against the United States for the recovery of . . . any sum alleged
to have been excessive or in any manner wrongfully collected under
the internal-revenue laws"?* (Emphasis added.)

wrongfully collected under, but which did not discharge the whole of, illegal assessments. Nor can it be denied that Congress has provided in § 1346 (a) that:

> "The district courts shall have original jurisdiction . . . of . . . Any civil action against the United States *for the recovery of . . . any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws."* (Emphasis added.)

English words more clearly expressive of the grant of jurisdiction to Federal District Courts over such cases than those used by Congress do not readily occur to me.

It must, therefore, be concluded that there is no sound reason for implying into § 1346 (a) a limitation that full payment of an illegal assessment is a condition upon the jurisdiction of a District Court to entertain a suit for refund. Inasmuch as no contradiction or absurdity is created by so doing, I think it is our duty to rely upon the words of § 1346 (a) rather than upon unarticulated implications or exceptions. Particularly is this so in dealing with legislation in an area such as internal revenue, where countless rules and exceptions are the subjects of frequent revisions and precise refinements.

By § 1346 (a) Congress expressed its purpose to waive sovereign immunity to suits, and to grant jurisdiction to District Courts over suits, to recover "any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws." Surely these words do not limit the waiver of immunity or the grant of jurisdiction to actions in which the entire amounts of illegal assessments have been paid. Even if the words "any internal-revenue tax" or "any penalty," when read in isolation and most restrictively, could be thought to contemplate only the entire amount of an illegal assess-

ment, the concluding phrase—"or any sum alleged to have been excessive or in any manner wrongfully collected"—leaves no room or basis for any such construction of the statute as a whole. Judged by its text and its history in relation to other provisions of the tax laws, as must be done, I cannot doubt that Congress plainly expressed its intention to waive sovereign immunity to suits, and to grant jurisdiction to District Courts over suits, against the United States to recover "any sum" alleged to have been wrongfully collected. Petitioner's complaint here alleged that the $5,058.54 which he had paid to the Commissioner upon the questioned assessment "has been illegally and unlawfully collected" from him. The complaint, therefore, stated a cause of action within the jurisdiction of the District Court.

But the Court does not so see it. The majority now hold, despite the statute, that full payment of an illegal assessment *is* a condition upon the jurisdiction of a District Court to entertain a suit for refund. It, therefore, seems appropriate, in order eventually to avoid the harsh injustice of permitting the Government unlawfully to collect and retain taxes that are not owing, to express the hope that Congress will try again.